Bobby J. GLASS, et al., Plaintiffs,

and

Federal Deposit Insurance Corp.,
Plaintiff-intervenor,

v.

The UNITED STATES, Defendant.

No. 92–428C.

United States Court of Federal Claims.

July 21, 2000.

Peter J. Broullire III, Albuquerque, New Mexico, for plaintiffs Bobby J. Glass, et al.

David L. Creskoff, Federal Deposit Insurance Corporation, Washington D.C., for plaintiff-intervenor Federal Deposit Insurance Corporation. Tina A. Lamoreaux, Stephen C. Zachary, John F. Elmore, of counsel.

Katherine M. Kelly, with whom were Mark A. Melnick, Assistant Director, David M. Cohen, Director, Commercial Litigation Branch, Civil Division, and David W. Ogden, Acting Assistant Attorney General, United States Department of Justice, Washington, D.C., for defendant. Delfa Castillo, Kenneth M. Dintzer, Michael Duclos, William G. Kanellis, and Kenneth M. Kulak, of counsel.

## OPINION

MARGOLIS, Senior Judge.

This action was originally filed June 25, 1992, and is one of what have come to be known as the *Winstar–Related Cases*. Following the decision of the Supreme Court, in *United States v. Winstar Corp.*, 518 U.S. 839, 870, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996), that the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA), Pub.L. No. 101–73, 103 Stat. 183, codified, in relevant part, at 12 U.S.C. § 1464 (1990), constituted an implicit breach of contract, Chief Judge Loren A. Smith granted summary judgment for the plaintiffs on the issue of liability. *See Glass v. United States*, 44 Fed.Cl. 73 (1999).[1] The case was then transferred to this judge for determination of damages. It is presently before the Court after an eight-day trial on damages held May 1 through May 11, 2000.

### BACKGROUND

During the early 1980's, an unusual and unanticipated situation arose in the interest rate sensitive financial environment of the savings and loan (S & L) industry generally. Inflation, increased competition from banks and other financial institutions, and particularly sustained high interest rates, caused an inversion of the interest rate spread upon which S & Ls are dependent. Mortgage loans, covering a period of many years, made in consonance with the earlier, significantly lower, interest rates now had to be serviced in a climate where the cost of capital to do so was higher than could have been anticipated. The short-term deposits that S & Ls rely on for new capital could command only a market place interest rate that was entirely out of balance with the income from the lower rate mortgage loans already on the books. Even well-managed S & Ls were losing money. Poorly run S & Ls or those in economically-challenged areas were failing at a disturbing rate.

There were two government agencies with regulatory authority over the S & Ls at that time. The Federal Home Loan Bank Board (FHLBB) was the primary regulator of the industry. The Federal Savings and Loan Insurance Corporation (FSLIC) afforded a

---

1. Chief Judge Smith determined that the FDIC has presented a justiciable claim against the United States in this case.

guarantee to depositors that the United States government stood behind the safety of deposits made at the S & Ls.[2] The FSLIC faced a potential obligation of billions of dollars on guaranteed deposits as S & Ls began to fail.

Immediate action was necessary to prevent an avalanche of S & L failures from bankrupting the FSLIC and with it the public's faith in the government's guarantee of deposits in insured institutions. The FHLBB, in its regulatory capacity, attempted to address these mounting problems through the use of capital forbearances, supervisory mergers, and the use of specially tailored regulatory accounting practices that deviated from generally accepted accounting principles (GAAP). The deviations included allowing the acquiring S & L to use the purchase method of accounting. The book value of the assets and liabilities of an acquired institution were adjusted to fair market value at the date of the combination. Any excess that was paid for the acquired business, including liabilities assumed, over the fair market value of net assets was recorded as goodwill. Goodwill was then an intangible asset that was amortized as an expense over a period of years. In the case of the failing S & Ls, goodwill, or "supervisory goodwill,"[3] as it came to be called, was equal to the negative net worth arrived at by converting the book value of assets and liabilities to market values, known as "marking them to market." Supervisory goodwill was counted toward the acquiring or merged S & L's regulatory capital reserves requirement, allowing it to leverage its own capital while providing a buffer in meeting the regulatory capital requirement in the future. *See Winstar,* 518 U.S. at 851, 116 S.Ct. 2432.

Security Savings Bank, FSB, (Old Security), located in Carlsbad, New Mexico, was just such an S & L in serious financial trouble. It was notified of its noncompliance with the minimum regulatory net worth requirement. Security was placed in "supervisory" status and severe restrictions on business operations were instituted by the FHLBB. The background facts of this particular case are set out in detail by Chief Judge Smith in *Glass v. United States,* 44 Fed.Cl. 73. Appropriate facts are provided herein for ease of reference.

In 1985, an agreement was entered into between FHLBB and Sentry Mortgage Corporation (Sentry) as authorized by 12 U.S.C. § 1464(p) and 1729(f). The agreement was part of the effort to form alliances between healthy institutions, such as Sentry, and failing S & Ls, such as Security, so that the resulting merged organization would have an opportunity to grow stronger over a period of time and, in the short term, weather the storm of the adverse financial climate.

Security entered into negotiations with Sentry for recapitalization as an alternative to Security closing its doors. On December 16, 1985, following the discussions with the FHLBB, Security and Sentry entered into a reverse purchase agreement. *Glass,* 44 Fed. Cl. at 75. In exchange for all of the business assets and liabilities of Sentry, the shareholders of Sentry received a controlling interest in Security's stock. *Id.*

Bobby Glass, Gary Stillwell, Stephen Strickland and Walter L. Rose were the principal stockholders of Sentry. *Glass,* 44 Fed. Cl. at 74–75. They are the shareholder plaintiffs in this action. The shareholders' stated intent in acquiring Security was: (1) to obtain access to secondary markets, such as Fannie Mae and Freddie Mac, (2) to use the thrift's deposits to fund their manufactured homes lending activities, and (3) to take advantage of the thrift's loss carry forwards to shelter future income. Tr. at 71–72, 81, 935–36.[4] Defendant admits that

---

**2.** Throughout the opinion, the Court will refer to FHLBB as the contracting entity and to FSLIC as the party benefited by the merger between Security and Sentry. This is true because the FSLIC was responsible for liquidating any failed banks, and by contracting with Sentry, FHLBB relieved FSLIC of that immediate responsibility.

**3.** Goodwill recognized under the purchase method of accounting as the result of an FHLBB-sponsored merger was generally referred to as "supervisory goodwill."

**4.** Throughout the opinion the following abbreviations will be used: transcript (Tr.), plaintiffs' exhibit (PX), defendant's exhibit (DX), and joint exhibit (JX).

plaintiffs were unable to take advantage of the loss carry forwards in the short time before FIRREA passed.

On February 26, 1986, Security submitted a detailed Business Plan/Notice of a Change in Control (Business Plan) to the Federal Home Loan Bank—Dallas. *Glass,* 44 Fed. Cl. at 76. The Business Plan conditioned the recapitalization of Security upon the FHLBB's agreement to regulatory and accounting forbearances, especially the use of a marked to market value for Sentry's assets and the application of supervisory goodwill toward the regulatory capital requirement during a 25-year amortization period. *Glass,* 44 Fed.Cl. at 76.

At the time of the Sentry–Security transaction, FHLBB policy required the principals of an acquiring institution to enter into a net worth maintenance agreement.[5] Tr. at 846. Roy Green, President and Principal Supervisory Agent for FHLB–Dallas, was involved in approving this transaction. At trial he stated that the FHLBB would not have approved the acquisition without a net worth maintenance agreement. Tr. at 845, 848. The net worth maintenance agreement was signed by the shareholder-plaintiffs. JX 49.

After the merger, Security was operated by the shareholder plaintiffs. The exhibits and documentation presented to the Court clearly outline the financial picture of Security from the time of the merger until the time of the passage of FIRREA, and to the time Security was placed into receivership. Specific details of that financial picture are discussed in the opinion below.

The FDIC became the successor in interest to Security after it went into receivership following the enactment of FIRREA on August 9, 1989. *Glass,* 44 Fed.Cl. at 80. The regulations thereunder instituted the tripartition of the capital requirement into tangible, core, and risk-based capital requirements. 12 U.S.C. § 1464(t). At least 1.5% of assets were required to be tangible assets. 12 U.S.C. § 1464(t)(2)(B). Supervisory goodwill was an intangible asset and would not qualify in meeting that requirement. A

small percentage of supervisory goodwill could be included in the core capital ratio or "leverage limit" of 3% of assets, but this allowance was to be phased out by the end of 1994. 12 U.S.C. § 1464(t)(1), (2) and (3)(A). This enactment also eliminated the FSLIC and FHLBB and replaced them with the Office of Thrift Supervision (OTS). OTS was directed to implement the FIRREA regulations. A new deposit insurance fund was created under the auspices of the FDIC, the Resolution Trust Corporation (RTC), to liquidate or dispose of closed S & Ls.

FIRREA thus required Security to exclude all of its supervisory goodwill from the calculation of its tangible capital and all but a small amount from its core capital calculation. In addition, only five years would be allowed to write off the remaining balance of $5.6 million of unamortized supervisory goodwill rather than the remaining 22 years under the original contract schedule. In an effort to save Security, shareholder plaintiffs filed a capital restoration plan with the OTS on January 5, 1990, following the enactment of FIRREA. JX 112. At the same time, Security filed an application for open thrift assistance with the FDIC with a copy of the capital restoration plan. *See* 12 U.S.C. § 1823. The request was for $8,202,133 from the FDIC in addition to $1,750,000 plaintiffs were willing to infuse to bring Security into capital compliance. Tr. at 1069, 1268; JX 111 at 0632, 0640, JX 112 at 0118, DX 298 at 0370. OTS rejected Security's capital restoration plan on April 27, 1990, with the open thrift assistance application still outstanding. The open thrift assistance application remained open even after Security was placed into receivership.

On May 3, 1990, the OTS placed Security into a pass-through receivership and then immediately into a conservatorship under the management of the RTC. The RTC operated Security under conservatorship as Security Federal Savings Bank from May 4, 1990 to November 16, 1990 when certain assets and deposits were sold, and Security Federal was placed into receivership. The receivership

---

5. The net worth maintenance agreement required that the four shareholder plaintiffs individually agree to maintain the capital requirements by infusing additional capital into Security, if necessary.

was concluded on October 1, 1994, when the RTC, in its corporate capacity purchased the remaining assets in liquidation of the receivership, issued a dividend to the claims and wrote off to equity the unpaid liabilities.

At the expiration of the RTC's mandate on December 31, 1995, all assets held by RTC–Corporate, including the breach of contract claim it acquired from the Security receivership, passed to the FSLIC Resolution Fund (FRF) by operation of law under 12 U.S.C. § 1441a (m)(2).

In his opinion regarding liability in this case, filed June 15, 1999, Chief Judge Smith held that there was an implied-in-fact contract with the FHLBB providing for, among other things, the allowance of supervisory goodwill to meet Security's regulatory capital requirement. Chief Judge Smith found that the shareholder plaintiffs have standing under an analysis similar to that concerning the investor third party beneficiaries in *Castle v. United States*, 42 Fed.Cl. 859, 866 (1999). Chief Judge Smith further held that the FDIC has standing, in its capacity as manager of the FRF–RTC, to bring this breach of contract action on behalf of the Security receivership under reasoning similar to that applied in *Statesman Savings Holding Corp. v. United States*, 41 Fed.Cl. 1, 8 (1998).

## DISCUSSION

Shareholder Plaintiffs (plaintiffs) assert that they are entitled to damages under three theories. First, plaintiffs argue that they are entitled to damages in the sum of $5.8 million, which equals the alleged value of Sentry at the time Sentry invested in Security Savings Bank. Plaintiffs are seeking a return of their investment, invested in reliance on the defendant's promise to allow them to use and amortize supervisory goodwill over the period of 25 years. Second, plaintiffs argue that they are entitled to damages amounting to $72,000, which represents the amounts expended on lawyers, accountants, etc. in acquiring Security. Finally, plaintiffs argue that they are entitled to restitution damages in the amount of $8,364,041, which represents the benefit they conferred on the defendant by merging with Security.

Defendant contends that plaintiffs are not entitled to any damages. First, defendant argues that plaintiffs committed a prior material breach of contract that relieved the defendant of its obligations under the contract. Defendant then argues that FIRREA did not cause any damage to Security and to plaintiffs because Security would have failed anyway absent the passage of FIRREA. Accordingly, defendant urges this Court to find that plaintiffs are not entitled to any damages.

With regard to valuation of damages, if any, defendant first argues that plaintiffs are not entitled to restitution damages in any case because plaintiffs did not provide any benefit to the government and because FIRREA did not affect the purpose of the contract. If, however, the Court chooses to award damages to the plaintiffs, defendant urges the Court to limit the amount of damages to the amount of plaintiffs' investment in Security and to deny plaintiffs recovery based upon any alleged savings to the FSLIC. Plaintiffs have argued that the amount of their initial investment in Security was $5.8 million. Defendant seeks to have this Court find that the actual value of plaintiffs' investment was no more than $3.9 million.

Defendant then argues that plaintiffs are not entitled to the $72,000 in transaction costs that they are requesting. Defendant contends that the expenses were in all likelihood actually incurred by Security or by Sentry, and not personally by plaintiffs, and thus are not recoverable to plaintiffs. Defendant also contends that plaintiffs did not provide adequate proof to the Court for the Court to find that plaintiffs did actually expend $72,000 in preparation to perform the contract. The Court finds that the expenses were incurred by Sentry, and that the expenditures decreased the value of Sentry at the time of the merger. The Court also finds the documentation and testimony presented to the Court credible. Accordingly, the Court will award the plaintiffs $72,000 in transaction costs.

Plaintiff-intervenor (FDIC) seeks $2.1 to $2.5 million in damages for the value of the goodwill that was destroyed by the passage

of FIRREA. Defendant argues that supervisory goodwill has no value or negative value. Defendant asserts that FDIC's own witness, Dennis Morrison, admitted that the amortization of goodwill could have an adverse effect on earnings and capital. Further, defendant argues that FDIC's witness, Dr. Arnold Heggestad, admitted that if goodwill leads to or compounds losses for the thrift, it has a negative value. Thus, defendant asserts that since goodwill only provides the ability to leverage, it had a negative value to Security under the circumstances.

Defendant argues that FDIC's calculation of damages is speculative and that FDIC did not prove that Security was damaged by FIRREA. Defendant also argues that to measure damages from the time of contracting is impermissible.

The Court finds that the defendant is liable for breach of contract. Damages in the total amount of $6.072 million are awarded. Plaintiff-shareholders are entitled to an award of $3.972 million, and intervenor-plaintiff FDIC is entitled to an award of $2.1 million.

## I. *Plaintiff–Shareholders Are Entitled To Damages.*

The Court will first address defendant's affirmative defenses. The Court will then state its findings regarding the valuation of plaintiffs' damages.

### A. *Defendant's Defenses Lack Merit and Must Fail.*

#### 1. *There Was No Prior Material Breach of Contract.*

■ Defendant contends that plaintiffs breached the contract prior to the passage of FIRREA and therefore may not receive damages for defendant's subsequent breach of the contract. As part of the transaction between Security and Sentry, the FHLBB required that plaintiffs each sign a net worth maintenance agreement. JX 23. The agreement was signed by each of the four shareholders on October 7, 1986 and required that:

each of the undersigned will individually cause the net worth of Security to be maintained at a level consistent with that required by Section 563.13(b) of the Rules and Regulations for Insurance of Accounts, as now or hereafter in effect, and where necessary, on a pro rata basis, to infuse sufficient additional equity capital, in a form satisfactory to the Supervisory Agent, to effect compliance with such requirement.

JX 49. The net worth maintenance agreement signed by plaintiffs was their personal guarantee that Security's regulatory net worth requirement would be maintained. Defendant contends that Security fell out of capital compliance on June 30, 1989, and that the plaintiffs breached this agreement by not recapitalizing Security.

The Court finds that on June 30, 1989, the managers of Security believed that it was in capital compliance. Tr. 214–15, 470. In fact, in its review of Security on October 31, 1989, even the government indicated that as of June 30, 1989 Security had $51,000 in excess capital. JX 106 at 2150. Later it would be revealed that Security was possibly out of compliance as of June 30, 1989, but this Court finds that based on the information possessed by plaintiffs on June 30, 1989, there was no reason for plaintiffs to believe that Security needed a capital infusion. Tr. at 470.

On November 30, 1989, long after the passage of FIRREA on August 9, 1989, Security's auditors made substantial negative adjustments to Security's June 30, 1989 financial reports. Tr. at 470; PX 342. These adjustments were made to reflect the increased risk to the financial stability of the institution after the passage of FIRREA. Tr. at 234–35. These negative adjustments increased Security's reported loss for 1989 by $680,792.[6] JX 100 at 2960. After these adjustments were made, Security reported a capital failure as of June 30, 1989 of $135,427. JX 100 at 2959. Plaintiffs argue that the capital shortfall was *de minimis* in relationship to the overall value of Security. The shortfall was $135,427 relative to $38

---

6. Security had originally reported its loss as $104,254. DX 233 at 1349. The amended financial statements showed losses of $785,046, a difference of $680,792. JX 100 at 2960.

million in assets or 0.36% (about one-third of 1%), which could not be considered a material breach of the net worth maintenance agreement. Plaintiffs contend that the amount of the shortfall was such that it would normally have been waived by the regulators. The Court agrees with plaintiffs that this amount is *de minimis*.

Plaintiffs argue that the government also waived any claim to a prior material breach of contract by failing to make a demand on the shareholders based on the net worth maintenance agreement. Plaintiffs presented evidence that in June 1989, Gary Stillwell personally had liquid assets sufficient to more than make up for the $135,427 capital shortfall had the demand been made. Tr. at 309–10. Furthermore, plaintiffs argue that in any event the claim was legally waived by the government by waiting more than 9 years to raise the claim.

Finally, plaintiffs argue that the net worth maintenance agreement they signed was not a contract. It was an FHLBB nonstandard condition enforceable only by a cease and desist order and proceedings. Plaintiffs argue that there are two reasons that this separate document could not be part of the contract for the use of supervisory goodwill on the books to meet regulatory capital. The first reason is that the net worth maintenance agreement was not executed until October 7, 1986, more than three months after the closing on the government's contract with Security and Sentry on June 30, 1986. JX 49 at 2042; JX 35 at 0142. Second, Chief Judge Smith has held that the plaintiffs are third party beneficiaries to the contract for the use of supervisory goodwill and that they are not parties to that implied-in-fact contract. *Glass*, 44 Fed.Cl. at 79.

The Court need not address the issue of whether the net worth maintenance agreement was a part of the contract or whether defendant waived this argument, because the Court finds that the agreement was not breached. There is sufficient evidence to show that as of June 30, 1989, Security was in capital compliance. Even under the worst scenario, Security was only out of capital compliance by about $135,000. The Court finds this amount to be *de minimis* and not a repudiatory breach of contract. Plaintiffs possessed sufficient funds to replace whatever capital shortfall existed and were willing to do so, at least until the passage of FIRREA. Tr. at 309–10. Once FIRREA had been passed, and plaintiffs realized they had been out of capital compliance, there was no reason for them to invest any more money in Security. Furthermore, even if the net worth maintenance agreement was part of the contract, plaintiffs would not have been expected to honor that part of the agreement once defendant breached the entire contract. *Far West Federal Bank v. Office of Thrift Supervision-Director*, 119 F.3d 1358, 1365 (9th Cir.1997) ("Following repudiation, the Investors had the absolute right to cease their own performance and obtain rescission and restitution."); *see also* Restatement (2d) of Contracts § 253(1) (1981) ("Where an obligor repudiates a duty before he has committed a breach by non-performance and before he has received all of the agreed exchange for it, his repudiation alone gives rise to a claim for damages for total breach."). However, even after FIRREA, plaintiffs stated that they would have been willing to invest at least $1.75 million in Security provided that the government gave Security open thrift assistance. Tr. at 1069. The Court finds the defendant presented no evidence showing it demanded that the alleged capital shortfall be funded by the plaintiffs. Given this evidence and the circumstances that existed, this Court cannot agree with defendant that the plaintiffs breached the net worth maintenance agreement. Accordingly, defendant's first defense must fail.

The Court has also considered defendant's argument that Security was again out of capital compliance as of September 30, 1989 and finds it without merit. It has been established in these *Winstar–Related Cases* that the passage of FIRREA on August 9, 1989 constituted an anticipatory repudiation. "When a party to a contract is faced with an anticipatory repudiation, '[t]he aggrieved party is entitled to sue either when the anticipatory repudiation occurs or at the later time for performance under the contract.'" *Plaintiffs in Winstar–Related Cases v. United States*, 37 Fed.Cl. 174, 183 (1997)

(citing Calvin W. Corman, Limitation of Actions § 7.2.1 (1991)). In this case, plaintiffs have chosen to seek damages from the time of the repudiation, which was August 9, 1989. Accordingly, the Court need not concern itself with events occurring after that date.

### 2. *Defendant Has Not Proven that Security Would Have Failed Absent FIRREA.*

Defendant's second defense is that its breach of contract (i.e. the passage of FIRREA) did not cause any damage to plaintiffs or FDIC because Security was doomed to fail despite the passage of FIRREA. Defendant urges the Court to find that Security's incompetent management, Security's bad asset portfolio, and the demise of the Texas economy almost certainly combined to cause the failure of Security, and that FIRREA was not the cause of Security's failure.

The Court finds that FIRREA did cause the failure of Security. Furthermore, it is not necessary that plaintiffs prove that FIRREA was the sole cause of their damage. It is sufficient for plaintiffs to prove that it was a significant contributing factor. *See Bowen v. United States Postal Service*, 459 U.S. 212, 238, 103 S.Ct. 588, 74 L.Ed.2d 402 (1983) ("a breaching defendant must pay damages equivalent to the total harm suffered, 'even though there were contributing factors other than his own conduct' ") (citing 5 A. Corbin, Contracts § 999 (1964)). Accordingly, defendant's second defense must also fail.

#### a. *Security's Management Was Competent and Not to Blame For Failure.*

Defendant claims that it was the poor quality of the management that the plaintiffs brought to Security that caused the thrift's failure, not the passage of FIRREA. In support of its claim, defendant notes that the shareholders acquired Sentry, a troubled institution which was losing approximately $80,000 per month, in spite of the fact that they had no prior experience operating a bank or thrift. Tr. at 330–31, 935. The Court disagrees with this argument. The record is replete with examples of the competence of Security's management. Gary Still-

well, Security's chief executive officer, testified for two days during the trial, and the Court found him to be a competent businessman and manager.

This opinion was shared by the FHLBB. On December 21, 1988, Security was awarded a MACRO 2 rating by the FHLB of Dallas in the midst of the financial crisis. Plaintiffs contend that this rating supports their assertion of good management policies and practices. The highest possible MACRO rating is a 1. Tr. at 178. A MACRO 2 rating means that an institution is fundamentally sound but may have some weaknesses which are correctable; that it is stable and able to withstand fluctuations; and its deficiencies are correctable in the ordinary course of business. Tr. at 1105. Even as late as February 9, 1990, FDIC Examiner Lelan D. Hewett noted in his examination report that "Management is considered competent and capable of operating the institution in an appropriate manner." DX 298 at 0372.

Gary Stillwell sought to cut expenses drastically during the economic crisis. He took a $1,000 a month personal salary cut, stopped the payment of any dues and private club memberships, cut back on expense accounts, implemented a hiring freeze, established restrictive travel allowances, stopped all contributions to charity, and decreased operating expenses such as telephone, postage, freight and delivery, printing, janitorial services, office supplies and other miscellaneous expenses. Tr. at 153–54. Management also put extra effort into trying to manage the repossession losses that were occurring at the time. Tr. at 154. When the Texas economy worsened, Security closed its offices in San Antonio and Tyler, Texas, which was expected to save the company about $740,000 per year. Tr. at 157. The Court finds that these managerial decisions were reasonable under the circumstances. Dr. Kenneth Cone, the government's expert witness, agreed that management's closing offices, cutting staff and cutting salaries could not be criticized. Tr. at 1450. Dr. Cone also agreed that the management of Security did what it had to during the economic crisis, which was to cut back on services, employ-

ees, and costs in general while closing branches. Tr. at 1464.

The Court finds this evidence sufficient to hold that Security did not fail because of incompetent management.

### b. *The Bad Assets Were Not to Blame for Security's Failure.*

Plaintiffs freely admit that Security had numerous bad assets on its books at the time of its merger with Sentry. Gary Stillwell testified that plaintiffs expected that it would take at least two years to begin turning around the bad assets which were on Security's books when they acquired it in June 1986. Tr. at 122. The Court finds that by August 1, 1989, Security had disposed of most of the bad assets which were inherited in 1986. Tr. at 250. Furthermore, the Court finds that Security's financial situation was actually improving by June 1989. Security lost $1,334,000 for the year ending June 1987, $1,499,000 for the year ending June 1988, but only $785,000 for the year ending June 1989. DX 1007. The Court finds that the bad asset portfolio did not cause the failure of Security.

### c. *The Economy Was Not to Blame for Security's Failure.*

Stillwell acknowledged during the trial that the manufactured homes market deteriorated during fiscal year 1987 and into 1988 which caused significant losses. The Court agrees with defendant that the record contains many examples of the losses caused to Security because of the downfall of the economy. However, the Court finds that the economy appeared to be turning around by late 1989. Dr. Cone, defendant's expert witness, testified that 1989 was the worst year for manufactured housing shipments in Texas and New Mexico. Tr. at 1352; DX 1016. The economy continued to improve after that, and by 1996, the economy had again reached the high from which it had begun to drop in 1982. DX 1016. This recovery by 1996 was only 10 years after the merger of Sentry and Security. The goodwill was expected to be used for 25 years. The Court finds that the economy did not cause the failure of Security.

### B. *Security's Failure Was A Direct and Proximate Result of the Passage of FIRREA.*

█ Plaintiffs presented evidence sufficient to satisfy the Court that the limitations set in place by FIRREA ultimately caused the demise of Security.

First, and most important, FIRREA severely restricted the use of supervisory goodwill to satisfy regulatory capital. The Court finds that this was a major contributing factor to the failure of Security. Security had contracted for the use of the supervisory goodwill for 25 years. At the time this contract was made, the plaintiffs and the defendant knew that the economy was in a repressed state and expected that it would take years for some of these thrifts to become GAAP solvent again. After the merger, no one expected a miraculous turn around by Security. The best that could be expected was a slow, methodical recovery. Stillwell testified that plaintiffs expected that it would take at least two years to begin turning around the bad assets which were on Security's books when they acquired Security in June 1986. Tr. at 122. The Court has already discussed above the evidence that the financial condition of Security, while perhaps not stellar, was improving.

After FIRREA passed, Security faced a more severe crisis than it ever had before. Besides not being able to count the goodwill toward tangible and risk-based capital requirements, it could no longer make loans to borrowers who did not reside within 100 miles of the thrift (Tr. at 265); later it could not make loans or investments without the prior written approval of the District Director of the Office of Thrift Supervision (DX 316 at 1192); it could not increase its deposits (Tr. at 264); it could not refinance sales of real estate which it owned (Tr. at 264); and it lost access for selling and servicing loans to secondary markets such as the Federal Home Loan Mortgage Corporation with which it had previously done much business (Tr. at 266).

Defendant argues that FIRREA did not, as plaintiffs claim, put "handcuffs" on Security causing its demise. The Court finds this

argument, in the face of the above evidence, untenable.

The Court has carefully considered all of the evidence presented on these issues, and finds that defendant has failed to prove that the failure of Security was imminent absent the passage of FIRREA. Moreover, the Court finds that even if defendant could prove that Security would have failed absent FIRREA, plaintiffs are still entitled to damages for defendant's repudiation of the contract. The Supreme Court, in the recent case of *Mobil Oil Exploration & Producing Southeast, Inc. v. United States,* — U.S. —, 120 S.Ct. 2423, 147 L.Ed.2d 528 (2000), faced a similar situation, and held that a party contracting with the government is entitled to restitution regardless of whether the government contract would, or would not, ultimately have produced a financial gain. *Id.* at 2437. In *Mobil Oil,* the defendant argued that the repudiation did not hurt the companies because they could not have explored for oil regardless of the repudiation. *Id.* The Court soundly rejected that argument. *Id.* The Court found that the oil companies did not "seek damages for breach of contract." *Id.* Rather, the parties sought "restitution of their initial payments." *Id.* Likewise, in this case, the plaintiffs are seeking only a return of their initial investment, made in reliance on the defendant's promise that plaintiffs could amortize goodwill over 25 years. The defendant repudiated that promise, and the plaintiffs are entitled to a return of that investment.

### C. *Shareholder–Plaintiffs Are Entitled to $3,972 Million in Damages.*

### 1. *Plaintiffs Are Entitled to a $3.9 Million Return of Investment.*

■ Defendant argues that plaintiffs have failed to prove the value of Sentry invested in Security on June 30, 1986 was either $5.8 million or $4.8 million. Defendant urges the Court to limit plaintiffs' recovery to $3.9 million because that is the amount that the FHLBB accepted as the value of the assets that Sentry contributed to Security as of June 30, 1986. The Court agrees with defendant that plaintiffs' recovery should be limited to $3.9 million.

The Geneva Corporation prepared a corporate evaluation report for Sentry as of December 17, 1985. DX 25. Expert witness, Neal Kaskel, served as Geneva Corporation's Director of Marketing Research from 1983 to 1988. Kaskel testified that the Geneva report did not include independently audited financial data for 1985, but relied on the financial data and forecast provided by Sentry. The latest audited financial data given to Geneva by Sentry in drafting the report was as of December 31, 1984.

The Geneva evaluation of $4.8 million on December 17, 1985, was contingent upon an "earnout provision" granted to any potential buyer of Sentry under which Sentry would remain the guarantor of payments on the portfolio of loans transferred in the sale of Sentry. Tr. at 1217–18; DX25 at 0494.

Plaintiffs assert that the Geneva report assumed that $1 million in cash would be removed from Sentry prior to any sale of the institution. The $1 million was not removed during the Sentry–Security transaction on June 30, 1986, and therefore plaintiffs claim that Sentry was worth $5.8 million. Tr. at 65. Plaintiffs assert that the valuation of Sentry was based on annual revenues of $1,750,000. PX 56 at 0202. Sentry's revenues for the year ending December 31, 1985, were actually $2,034,624, which exceeded the base of $1,750,000. JX 19 at 1120.

Further, plaintiffs assert that they contributed another $100,000 to $120,000 of their insurance agency earnings into Security. Tr. at 464. Plaintiffs argue that the $3.9 million bookkeeping entry by Security for capital regulatory accounting purposes does not represent the actual fair market value of plaintiffs' investment in Security, which was $5.8 million.

Defendant argues that the assets listed on page 23 of the Geneva report include the $1 million surplus cash. DX 25 at 0470. Defendant argues that, as plaintiffs admit, Sentry transferred a $1,125,000 tax liability to Security. This liability would more than off set the $1 million in cash. DX 25 at 0470. Of this, plaintiffs contend that the liability was transferred in order for Security to have the benefit of a loss carry forward. Defendant

notes that there was never sufficient income after the transaction between Sentry and Security for Security to use this potential tax advantage.

Plaintiffs assert that the FHLBB took a conservative approach where non-cash assets were concerned and valued them at an 80% rate for regulatory accounting purposes. Thus the $4.8 million fair market value of Sentry was reduced, for reporting purposes, to an accounting entry value of $3.9 million. JX 24. Plaintiffs argue that many government documents introduced into evidence state that the value of the assets contributed to Security by Sentry was $4.8 million. DX 293 at 1; JX 121 at 0633.

Joseph Arrendes, Assistant Director of Regional Operations at FHLBB and Roy Green, the President and Principal Supervisory Agent for FHLB–Dallas testified regarding the negotiations that resulted in the $3.9 million valuation of Sentry. Defendant argues that Arrendes' testimony that the FHLBB did not arbitrarily reach the $3.9 million valuation for Sentry by taking 80% of the proposed $4.8 million should be conclusive on the matter.

Defendant argues that plaintiffs accepted that Sentry's value was no more than $3.9 million. Shareholders ultimately agreed to proceed with the acquisition after the negotiations regarding value. On June 30, 1986, the FHLBB issued Resolution No. 86–672, approving the non-cash contribution of Sentry's net assets to Security, stating that the assets could be recorded on Security's books "at fair market value not to exceed $3.9 million." JX 43.

The Court finds that the plaintiffs failed to prove that the fair market value of Sentry was $5.8 million. Accordingly, the Court finds that the fair market value of Sentry at the time of the merger was $3.9 million, as reflected in government records. Accordingly, plaintiffs are entitled to $3.9 million in damages.

### 2. Plaintiffs are Entitled to a Return of Their $72,000 Transaction Costs.

■ Plaintiffs presented evidence that Sentry had expended around $72,000 on accounting and legal fees in preparation of the merger between Sentry and Security. Defendant contends that the plaintiffs are not entitled to these damages because these expenses were incurred by Sentry and not by plaintiffs directly. Defendant further contends that the plaintiffs did not provide sufficient documentation to allow the Court to find that plaintiffs actually incurred $72,000 in direct costs associated with the merger. The Court rejects both arguments.

First, the Court notes that it is awarding the plaintiffs the value of Sentry at the time of the merger. It follows that whatever expenditures made by Sentry prior to the merger only served to decrease the value of Sentry at the time of the merger. Accordingly, plaintiffs are entitled to a return of these expenditures as well.

Second, the Court has reviewed both the documentation and the testimony of Gary Stillwell, and finds both to be credible. Stillwell informed the Court that he had deleted accounting and legal fees and expenses which were not made in preparation of the merger. Tr. 313–15; 493–94. The Court has reviewed the ledgers presented and finds that the total gross amounts expended are far higher than that claimed by plaintiffs. See PX 691b and PX 714. Accordingly, the Court finds that plaintiffs are entitled to $72,000 in direct costs associated with the merger.

## II. FDIC is Entitled to Damages Equal to the Value of Supervisory Goodwill.

### A. Contrary to Defendant's Argument, Supervisory Goodwill Does Have Value.

■ Defendant argues that supervisory goodwill was merely an accounting entry and has no intrinsic value. Tr. at 642, 649, 651, 655–57. Defendant further argues that the model used by FDIC's expert, Dr. Arnold Heggestad, Ph.D., does not take into account the likelihood that Security would have failed anyway absent the breach. Tr. at 751. Dr. Heggestad, an economist with extensive bank and thrift expertise, testified at trial regarding the value of the goodwill. Defendant argues that no investor would be willing to pay for the goodwill of an institution that was

about to be seized by regulators. Tr. at 1359. Defendant also challenges the model used to value the goodwill because it includes transaction costs that were not actually incurred, but are simply hypothetical. Tr. at 666–67, 737–38, 1360, 1362–63.

First, FDIC argues that it is a simple, undeniable principle that a bargained-for promise from the government had a real economic value to the promisee. *Winstar,* 518 U.S. at 866, 116 S.Ct. 2432.

Second, FDIC argues that value is demonstrated by the fact that supervisory goodwill was allowed under regulatory accounting principles to keep failing institutions open even though their reported equity would have been negative under GAAP accounting. *Winstar,* 518 U.S. at 846, 850–51, 116 S.Ct. 2432.

> This treatment was, of course, critical to make the transaction possible in the first place, because in most cases the institution resulting from the transaction would immediately have been insolvent under federal standards if goodwill had not counted toward regulatory net worth.

*Id.* at 850, 116 S.Ct. 2432.

Dr. Heggestad testified that a crucial and valuable attribute of supervisory goodwill was that it allowed Security to open its doors. Old Security was insolvent. Supervisory goodwill was necessary even with Sentry's contribution of all of its assets in order for Security to meet the regulatory requirements. With the agreed upon goodwill, the minimum capital requirements were exceeded.

> Recognition of goodwill under the purchase method was essential to supervisory merger transactions of the type at issue in this case. Because FSLIC had insufficient funds to make up the difference between a failed thrift's liabilities and assets, the Bank Board had to offer a "cash substi-

tute" to induce a healthy thrift to assume a failed thrift's obligations.

*Id.* at 849–50, 116 S.Ct. 2432. Supervisory goodwill was the "cash substitute." Without this goodwill accounting the FHLBB would have had nothing to induce viable thrifts to take on the troubled assets of failing institutions. *Winstar,* 518 U.S. at 850, 116 S.Ct. 2432. The government allowed Security to amortize the goodwill on a straight-line basis over a 25-year period. *Glass,* 44 Fed.Cl. at 76–78. The total amount of supervisory goodwill that resulted from Old Security's recapitalization agreement with the FHLBB was $6,358,487. *Id.* at 76.[7]

Third, FDIC argues that supervisory goodwill allowed thrifts to leverage their capital. The amount of new business in the form of loans that an institution may take on is controlled by capital reserves. The higher the reserves, the more the business may grow and prosper. Tr. at 614–16; *Winstar,* 518 U.S. at 851, 116 S.Ct. 2432.

The Court finds that the reason for the long 25-year period of goodwill amortization provided for in the agreement was to allow a cushion against future losses in the troubled market at the time of the transaction. Tr. at 607, 609, 753. At the time of the transaction, the contracting parties were aware that substantial time would be needed for the economic cycle to turn around and for the institution to recover thereafter. Morrison, FDIC's expert in thrift accounting, testified that by taking away the promised goodwill at the bottom of the economic cycle, the government deprived Security of the benefit of its bargain. Tr. at 554–55, 570–71; DX 1016.

**B. *The Supervisory Goodwill Was Worth $2.1 Million at the Time of the Breach.***

As Dr. Heggestad testified at trial, the cash value of goodwill is necessarily less than 100% of its face amount. Tr. at 624. This is

---

7. The components of goodwill are correctly stated, but a mistake was made in combining the components. The correct total should be $6,358,487. PX 750a. FDIC's accounting expert, Dennis Morrison, testified that the $6,358,487 of supervisory goodwill created at the beginning of the contract was subsequently adjusted by Security's accountants. PX 750c. Dr.

Heggestad testified that these adjustments would reduce the damage calculation in his expert report slightly. The cash value of goodwill at the time of contract would be reduced by $300,000 and the cash value at the time of breach would be reduced by $100,000, resulting in $2.5 million at the time of contract and $2.1 million at the time of breach. Tr. at 636–38.

true for two basic reasons. First, because goodwill is amortized, it becomes less by approximately $250,000 per year over the 25-year amortization period. Tr. at 619–20; PX 750b. Second, because goodwill is not negotiable or transferable, it cannot be invested and has no potential to increase. Tr. at 619–20.

Dr. Heggestad testified regarding a method to ascertain the cash value of the goodwill taken away by FIRREA for purposes of determining damages. The benefit to the institution of having goodwill on its books is basically that it provides cash flow. Therefore, the replacement of cash flow is what Dr. Heggestad's model seeks to replicate using the hypothetical of preferred stock issuance.

Defendant argues that the replacement cost of an asset is not necessarily related to the value of the asset to the company. That is certainly true in this case, since the loss of the asset destroyed the institution entirely. FDIC, however, is willing to settle for the more reasonable and calculable replacement value of the asset taken away.

Defendant argues that the institution was about to be seized, and therefore the goodwill was valueless. The Court is unwilling to speculate at this point as to whether Security would have failed had the use of goodwill on its books not been removed in advance of the 25 years afforded by the contract.

Defendant is incorrect in claiming that the leveraging power of goodwill actually had an adverse effect on earnings and capital, and therefore it had a negative value to Security. The Supreme Court held that the intent of supervisory goodwill was to allow the thrift to leverage more loans over long periods. *Winstar*, 518 U.S. at 851, 116 S.Ct. 2432. This was not a temporary solution or a quick fix to the dire situation in the thrift industry as a whole. The long period of amortization was as much a part of the inducement for these mergers of healthy institutions with failed institutions as was the use of supervisory goodwill itself. It was not anticipated that a miraculous recovery would occur in the first three years of the 25-year amortization period afforded Security by this contract. Yet in the three years before the breach constant improvement was made. As mentioned above, the losses by 1989 were down significantly from the 1986 losses. DX 1007.

The Court finds that the goodwill had value for as long as Security's doors were open, since it was the goodwill that was keeping the doors open from the inception of this contract entered into by the government. At trial, defendant demonstrated graphically how the value of the goodwill, as a practical matter, became more valuable as the institution came closer to having its doors closed by the regulators. DX 1003. It was that very aspect of the bargained for goodwill that led to the transaction in the first place. Old Security, with its insolvency, would have been of no use to the acquirer had the goodwill not opened the doors for business. Tr. at 607. Even Dr. Cone had to agree that the assets received, including the goodwill, had to balance the liabilities assumed. Otherwise, there would have been no recapitalization. Tr. at 1498.

Defendant argues that Dr. Heggestad's model is irrelevant because there is no evidence that a cash infusion instead of goodwill was ever discussed as an option by the FSLIC. Defendant's expert, Dr. Cone, testified that determining the cost of replacing Security's goodwill with cash is also irrelevant because Security did not attempt to do so in reality. Tr. at 1359–62. Defendant asserts that this is shown by the fact that no new investors came forth. Tr. at 1359–62, 1336–39.

The Court finds that this reasoning is mistaken in both instances. It is the determination of damages that requires the replacement of goodwill. That is what Dr. Heggestad's model seeks to do. There is cost involved when something is replaced. The model must account for that. Security's right to use supervisory goodwill on its books was taken away by FIRREA. Damages are sought to replace that asset. Those damages cannot be calculated without accounting for the cost of replacement. Having the use of the asset and getting the cash flow it represented on the books again, is essential in valuing the asset. The transaction costs are hypothetical as is the entire

model. The model represents damages, a value calculation for the usefulness of something that was contracted for, not an actual transaction.

Dr. Heggestad testified that, since Security had $6,358,487 in goodwill, rather than cash to invest, Security essentially agreed to forego income equal to the amount it could have earned by investing cash. Tr. at 625, 628, 631, 632. However, because the goodwill had to be amortized over its 25-year life, cash flow would be reduced. DX 435.

As of the date of the contract, Dr. Heggestad determined the earnings cash would have had, that goodwill did not have. For this calculation, Dr. Heggestad chose the 1986 Treasury Bond rate of 7.24%, because that would be the lowest earning long term asset available that a thrift would be likely to purchase.[8] Tr. at 632. The earnings foregone in the first year would be approximately $451,147. With annual amortization, the foregone earnings would decline, resulting in $9,207 foregone in the 25th year. Income foregone would total approximately $4,069,-028. Tr. at 633–34; PX 750t, PX 750w.

Because the net present value would be less than that, Dr. Heggestad's model then assumes that Security issues a hypothetical security in return for cash for the sake of calculating the net cash flow value of the goodwill. In this hypothetical transaction, the cash is equal to the face amount of the intangible asset—goodwill. To account for the attributes of goodwill that make it worth less than cash as mentioned above, Dr. Heggestad's model assumes that the hypothetical security issued in exchange for the cash is preferred stock. It was necessary to determine what rate of return an investor would demand for the risk involved. Tr. at 628–30; PX 750s, PX 750t, PX 750w.

Thus Dr. Heggestad determined the appropriate discount rate for valuing the cash flows as of a single point in time. The appropriate discount rate is the rate an investor would require to invest cash in Security. That rate in 1986 was not less than 14%.[9] Tr. at 629–30; PX 750t.

Using that information, Dr. Heggestad backed out the value that cash has and goodwill lacks, leaving the value goodwill does have. Transaction costs of $540,367 were calculated at 13.28% of the capital raised. PX 750v; DX 435.

Dr. Heggestad testified that his model results in a cash value of $2,289,459 for the $6,358,487 of goodwill Security was granted by its contract with the government. Tr. at 635. That value was reduced by $300,000 at trial for an accounting adjustment made by Security's accountants after the contract. Tr. at 636. Thus FDIC, as receiver for Security, claims $2.5 million in damages, as follows: (Tr. 635–36)

| | |
|---|---|
| Face Amount of Goodwill | $6,358,487 |
| Less: Net Present Value of Foregone Cash Flow | (4,069,028) |
| Equals: Value of Goodwill | $2,289,459 |
| Plus: Transaction Costs that Would be Necessary to Replace Goodwill | 540,367 |
| Equals: Cash Flow Value to Security of Goodwill | $2,829,826 |
| Less: Accounting Adjustment Made Post–Contract | (300,000) |
| Equals: Damages Measured from Date of Contract | $2,529,826 |

PX 750w.

Defendant argues that FDIC's measuring of damages from the time of contracting is impermissible. Defendant argues that the law of this circuit requires that damages must be measured as of the time of breach of contract. *See, e.g., Estate of Berg v. United States*, 231 Ct.Cl. 466, 469, 687 F.2d 377 (1982); *Northern Paiute Nation v. United States*, 9 Cl.Ct. 639, 643 (1986); *Cavanagh v. United States*, 12 Cl.Ct. 715, 717 (1987). Therefore, FDIC's calculation of damages from the date of the contract, June 30, 1986, is not permitted.

8. Throughout his model, Dr. Heggestad uses a conservative choice of the alternatives available. In this case the lower rate of return used increases damages. In other instances the conservative choice decreases damages, but the conservative option is consistently used.

9. As indicated in footnote 8, above, the conservative choice is again used here. In this case a higher rate than 14% would have increased the amount of damages.

The Court agrees that FDIC damages are to be calculated as of the date the contract was breached. Until that time Security did not have a cause of action against the government. Damages are awarded to FDIC from the date of breach.

In the alternative, using the same economic model, FDIC claims $2.1 million if the Court finds that damages are to be measured from the date of breach, as follows: (Tr. at 638)

| | |
|---|---|
| Face Amount of Goodwill | $5,595,469 |
| Less: Net Present Value of Foregone Cash Flow | (3,936,332) |
| Equals: Value of Goodwill | $1,659,137 |
| Plus: Transaction Costs that Would be Necessary to Replace Goodwill | 522,745 |
| Less: Accounting Adjustment Made Post–Contract | (100,000) |
| Equals: Damages Measured from Date of Breach | $2,081,882 |

DX 435 at 1730. The value was reduced by $100,000 at trial for an accounting adjustment made by Security's accountants after the contract. Tr. at 636–37. Thus, FDIC's damages measured from the date of the breach are $2.1 million.

Defendant argues that Dr. Heggestad's model is insufficient as a measure of damages because it is speculative. Defendant cites *San Carlos Irrigation & Drainage Dist. v. United States*, 111 F.3d 1557, 1563 (Fed. Cir.1997); *Roseburg Lumber Co. v. Madigan*, 978 F.2d 660, 667 (Fed.Cir.1992); and *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 562–63, 51 S.Ct. 248, 75 L.Ed. 544 (1931) in support of defendant's position.

Defendant is mistaken. In *San Carlos*, it was the obligation of defendant to plaintiff that was uncertain, not the calculation of damages. The Court found that there were "[t]oo many contingencies-including, most importantly, the discretion of the agency ...." *San Carlos*, 111 F.3d at 1563. Similarly, in *Roseburg* the holding in defendant's favor turned on the fact that the Court could not ascertain injury to plaintiff with certainty. Again, in *Roseburg* it is not the calculation of damages that is uncertain, but rather to what degree, or whether, there was any actionable injury to plaintiff's interests. *Roseburg*, 978 F.2d at 668.

*Story Parchment* does address the issue of certainty regarding damages, but does not support defendant's position. There the Court stated:

> Where the tort itself is of such a nature as to preclude the ascertainment of the amount of damages with certainty, it would be a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for his acts. In such case, while the damages may not be determined by mere speculation or guess, it will be enough if the evidence show the extent of the damages as a matter of just and reasonable inference, although the result be only approximate. The wrongdoer is not entitled to complain that they cannot be measured with the exactness and precision that would be possible if the case, which he alone is responsible for making, were otherwise.

*Story Parchment Co.*, 282 U.S. at 563, 51 S.Ct. 248 (citing *Eastman Kodak Co. of New York v. Southern Photo Materials Co.*, 273 U.S. 359, 379, 47 S.Ct. 400, 71 L.Ed. 684 (1927)). Although *Story Parchment* is a tort action, the principle as stated is equally appropriate regarding damages for breach of contract. *See also Electronic & Missile Facilities, Inc. v. United States*, 189 Ct.Cl. 237, 257, 416 F.2d 1345 (1969) ("[W]here responsibility for damages *is* clear, it is not essential that the amount thereof be ascertainable with absolute exactness or mathematical precision ...") (italics in original).

The government and its expert, Dr. Cone, assert that Security's damages must be limited to not more than its equity value. Tr. at 1408–10, 1412–13, 1416–17. Dr. Cone testified that the value of Security at the time of the breach was in the range of $200,000 to $500,000 by using a comparison with other thrifts. Tr. at 1418–19; DX 1018, DX 1018R.

The Court agrees with FDIC that the equity value of Security is irrelevant. For example, a bankruptcy court does not value the assets of a corporation by determining the solvency of the corporation. If it did, the value of each asset would always be less than

zero. Clearly each asset has a value of its own. Security contracted for the use of supervisory goodwill. FIRREA took away that bargained for asset. The amount of damages is the reasonable cash value of that intangible asset itself.

### C. *The FDIC is Entitled to $2.1 Million in Damages.*

At the time of the transaction between Sentry and Security, FSLIC had less cash than its obligations as guarantor of the failing thrifts required. The practical options available to the FSLIC were therefore limited. They would be: (1) to liquidate Old Security; (2) to infuse cash sufficient to meet the minimum capital requirements and keep the institution in business; or (3) to sanction the merger with Sentry and grant supervisory goodwill as it did. The defendant has presented little evidence that there were any other options available to FSLIC in June 1986. Accordingly, FSLIC chose to deal with the situation in the manner most advantageous to it. The use of supervisory goodwill granted to acquiring institutions saved the FSLIC cash. *Winstar*, 518 U.S. at 850, 116 S.Ct. 2432. The Court finds that this was a benefit to the defendant. However, the Court has chosen not to measure the recovery to the FDIC by the benefit conferred on the defendant. Rather, the Court has determined that the appropriate measure of recovery is the value of the asset that was taken away from Security because of the breach. The Court therefore awards FDIC, as receiver for Security, $2.1 million, which the Court finds is the appropriate value of the goodwill remaining at the time the government breached the contract by the passage of FIRREA.

### CONCLUSION

For the foregoing reasons, the Court finds the defendant liable for breach of contract and awards total damages to plaintiffs and plaintiff-intervenor in the sum of $6.072 million. The Clerk shall enter judgment in favor of plaintiff-shareholders in the amount of $3.972 million. The Clerk shall enter judgment in favor of plaintiff-intervenor FDIC in the amount of $2.1 million. Costs for the plaintiff-shareholders and plaintiff-intervenor FDIC.

