**CALIFORNIA FEDERAL BANK, FSB, Plaintiff–Cross Appellant,**

v.

**UNITED STATES, Defendant– Appellant.**

Nos. 99–5108, –5119.

United States Court of Appeals, Federal Circuit.

DECIDED: April 3, 2001.

Theodore B. Olson, Gibson, Dunn & Crutcher, LLP, of Washington, DC, argued for plaintiff-cross appellant. With him on the brief were Theodore J. Boutrous, Jr., Mark A. Perry, and David B. Salmons. Of counsel were John C. Millian, and Paul Blankenstein.

Jeanne E. Davidson, Deputy Director, Commercial Litigation Branch, Civil Division, Department of Justice, of Washing-

ton, DC, argued for defendant-appellant. With her on the brief was David M. Cohen, Director, Commercial Litigation Branch. Of counsel on the brief were Lee M. Straus, Elizabeth W. Newsom, Kenneth M. Kulak, Tarek Sawi, and Teresa A. Kolb, Attorneys, Commercial Litigation Branch. Also of counsel on the brief were Scott R. McIntosh, Special Counsel; Thomas M. Bondy, and Susan Pacholski, Trial Attorneys, Appellate Staff. Of counsel was Jonathan Lawlor, Trial Attorney, Commercial Litigation Branch.

Jerry Stouck, Spriggs & Hollingsworth, of Washington, DC, for amicus curiae Plaintiffs' Coordinating Committee. Of counsel on the brief were Charles J. Cooper, and Steven S. Rosenthal, Cooper, Carvin & Rosenthal, PLLC, of Washington, DC; and Melvin A. Garbow, Arnold & Porter, of Washington, DC.

John V. Thomas, Assistant General Counsel, Federal Deposit Insurance Corporation, of Washington, DC, amicus curiae for Federal Deposit Insurance Corporation. With him on the brief were Dorothy A. Doherty, Counsel; John M. Dorsey III, Senior Counsel; and Richard Gill, Counsel.

Before MAYER, Chief Judge, PLAGER, Senior Circuit Judge,* and LINN, Circuit Judge.

MAYER, Chief Judge.

The United States appeals the summary judgment of the United States Court of Federal Claims holding the government liable for breach of its contract with California Federal Bank (Cal Fed) pertaining to the regulatory treatment of a series of mergers of Cal Fed with other thrifts. *See California Fed. Bank v. United States,* 39 Fed.Cl. 753 (1997) (*Cal Fed I*). Cal Fed cross-appeals the Court of Federal Claims' denial of lost profits and restitutionary relief and its calculation of Cal Fed's costs due to the breach. *See California Fed. Bank v. United States,* 43 Fed. Cl. 445 (1999) (*Cal Fed II*). We affirm-in-part, vacate-in-part, and remand.

*Background*

The history and circumstances surrounding the thrift crisis of the early 1980s and the enactment of the Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA), Pub. L. 101–73, 103 Stat. 183, in 1989 have been extensively discussed in the original *Winstar* cases and will not be revisited here. *See United States v. Winstar Corp.,* 518 U.S. 839, 843–858, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996) (*Winstar III*).

This action is one of more than 120 pending *Winstar*-related cases. To improve efficiency and preserve judicial resources, the Court of Federal Claims selected four exemplary cases, including this one, that it considered via hearings and summary judgment motions to decide the common issues pertaining to the liability of the government and to resolve dispositively any common issues for the remaining *Winstar*-related cases. The numerous plaintiffs were organized into a Plaintiffs Coordinating Committee (PCC) which identified 13 common issues it believed were raised in the government's summary judgment briefing. The court found 11 of these to be present in the four exemplary cases.

The transactions at issue here are threefold: 1) Cal Fed's 1982 acquisition of three Georgia thrifts and one Florida thrift (the Southeastern transaction); 2) Cal Fed's 1982 acquisition of Brentwood Savings and Loan Association (Brentwood), a California thrift; and 3) Cal Fed's 1983 acquisition of Family Savings and Loan Association (Family), a Nevada thrift.

* Judge Plager assumed senior status on November 30, 2000.

In the Southeastern transaction, Cal Fed assumed $305.67 million in net liabilities through four supervisory mergers in February 1982. It entered into an assistance agreement with the government under which it received a forbearance letter permitting the excess liabilities to be recorded as supervisory goodwill and amortized over 35 to 40 years, and a $9 million capital credit from the Federal Savings and Loan Insurance Corporation (FSLIC) as an additional inducement. Cal Fed later sold these southeastern thrifts. The government does not dispute the presence of a contract with Cal Fed regarding the Southeastern transaction because the assistance agreement contained a provision that explicitly incorporated the contemporaneous forbearance letters.

However, the government does contest the presence of a contract in the remaining two transactions, in which there was no capital credit inducement provided by the FSLIC and, accordingly, no assistance agreement explicitly incorporating the forbearance letters into a single document. By a September 2, 1982 letter, in its acquisition of Brentwood, Cal Fed specifically requested approval from the Federal Home Loan Bank Board (FHLBB) to amortize goodwill created by the acquisition over the estimated useful life of 35 years. The FHLBB approved the acquisition on September 30, 1982, and on October 1, 1982, issued a forbearance letter stipulating that the resulting association may amortize any goodwill created over 35 years. The FHLBB agreed not to enforce its net worth requirements for a period of five years to the extent that Cal Fed's failure to meet the requirements was attributable to the assets or liabilities acquired from Brentwood. Cal Fed assumed $314.63 million in net liabilities from Brentwood in October 1982.

The Family acquisition proceeded similarly, though the commitment regarding amortization of goodwill was contained in the Acquisition Agreement, Article 6.1(a), which stated that the resulting association of Cal Fed and Family may amortize any goodwill created under the purchase method of accounting using the straight line method over the useful life of 40 years. This amortization was structured in the agreement as a condition precedent to Cal Fed's obligations. The merger application sent to the FHLBB included the acquisition agreement and an additional request to approve the 40–year amortization. In two subsequent forbearance letters dated November 26, 1982, and January 5, 1983, the FHLBB confirmed Cal Fed's entitlement to record the merger under the purchase method of accounting and amortize resulting goodwill over 40 years. Cal Fed assumed $17.74 million in net liabilities in its acquisition of Family in 1983. As in the Brentwood transaction, the FHLBB agreed not to enforce its net worth requirements for a period of five years to the extent that Cal Fed's failure to meet the requirements was attributable to the assets or liabilities acquired from Family. In all three transactions, Cal Fed was permitted to count goodwill as an asset for regulatory capital purposes for as long as it remained on their accounting records.

Cal Fed brought suit against the government in the Court of Federal Claims for breaching its merger agreements by enacting FIRREA, which forced the accelerated phase-out of goodwill over a five-year period beginning in 1989. The court held on summary judgment that the government was liable for breach of its contract with Cal Fed and referred the case to trial on the issue of damages. Before trial, the court denied the claim for lost profits on summary judgment because of their highly speculative nature. After trial, the court awarded Cal Fed the sum of $22.967 million in damages as the cost of replacing the regulatory capital lost due to the accel-

erated phase out of goodwill under FIR-REA. The court denied Cal Fed's request for restitution because it had not proven that its agreement to assume the net liabilities of the acquired thrifts was a cost in the circumstances of this case, and rejected wounded bank damages based on insufficient proof of causation. The United States appeals and Cal Fed cross-appeals.

## Discussion

The Tucker Act grants the Court of Federal Claims jurisdiction over actions "founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1) (1994). We have jurisdiction under 28 U.S.C. § 1295(a)(3) (1994).

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. We review a grant of summary judgment by the Court of Federal Claims *de novo* to determine whether the summary judgment standard has been correctly applied. *Winstar Corp. v. United States*, 64 F.3d 1531, 1539 (Fed.Cir.1995) (en banc) (*Winstar II*) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)); *Southfork Sys., Inc. v. United States*, 141 F.3d 1124, 1131 (Fed. Cir.1998).

■■■ Whether a contract exists is a mixed question of law and fact. *Cienega Gardens v. United States*, 194 F.3d 1231, 1239 (Fed.Cir.1998) (citation omitted). We review the trial court's legal conclusions independently and its findings of fact for clear error. *Glendale Fed. Bank, FSB v. United States*, 239 F.3d 1374, 1379 (Fed. Cir.2001). "[A]ny agreement can be a contract within the meaning of the Tucker Act, provided that it meets the requirements for a contract with the Government, specifically: mutual intent to contract including an offer and acceptance, consideration, and a Government representative who had actual authority to bind the Government." *Massie v. United States*, 166 F.3d 1184, 1188 (Fed.Cir.1999) (quoting *Trauma Serv. Group v. United States*, 104 F.3d 1321, 1326 (Fed.Cir.1997)). Contract interpretation is a question of law, which we review *de novo*. *Cienega Gardens*, 194 F.3d at 1239 (citing *Winstar II*, 64 F.3d at 1540).

## I.

■■■ The government concedes that a contract existed in the Southeastern transaction, but argues that the absence of an assistance agreement incorporating the forbearance letters precludes a finding that a contract existed in the Brentwood and Family transactions. *Winstar II*, however, did not rely exclusively on the assistance agreements to find a contract; it considered contemporaneous documents and surrounding circumstances that included forbearance letters like those present here. 64 F.3d at 1540. The assistance agreements were executed between acquiring thrifts and the government only in those situations where the government included a further inducement to the acquiring thrift to complete the transaction in the form of a capital credit. "Such credits arose when FSLIC itself contributed cash to further a supervisory merger and permitted the acquiring institution to count the FSLIC contribution as a permanent credit to regulatory capital." *Winstar III*, 518 U.S. at 853, 116 S.Ct. 2432. The fact that Cal Fed did not enter into an assistance agreement by which it would receive direct cash assistance from the FSLIC in the Brentwood and Family transactions (as it did in the Southeastern transaction) is not dispositive of the issue of contract

formation between the government and Cal Fed. Similarly, the difference in the form of consideration offered by the government in the Southeastern transaction, on the one hand, and the Brentwood and Family transactions, on the other, does not negate the bargained-for exchange in the latter two transactions. Here, as in *Winstar III,* the government bargained with Cal Fed to assume the net liabilities of the acquired thrifts in exchange for favorable regulatory consideration allowing goodwill to be counted as an asset for regulatory capital purposes and to be amortized over 35 to 40 years. We agree with the Court of Federal Claims that "[i]f the factual records of individual cases show intent to contract with the government for specified treatment of goodwill, and documents such as correspondence, memoranda and [FHLBB] resolutions confirm that intent, the absence of an [assistance agreement] or [supervisory action agreement] should be irrelevant to the finding that a contract existed." *Cal. Fed. I,* 39 Fed.Cl. at 773. We therefore conclude that there were legally binding bargained-for exchanges in the Brentwood and Family transactions as well as in the Southeastern transaction.

We have no doubt that both the government and Cal Fed provided consideration for the agreements. Based on all of the contemporaneous documents in each of the three transactions, the FHLBB and the FSLIC were contractually bound to recognize the supervisory goodwill and the amortization periods reflected in the forbearance letters. In the Southeastern transaction, the government also was bound by the terms of the assistance agreement to provide a capital credit of $9 million in addition to the favorable regulatory treatment of supervisory goodwill. Cal Fed was reciprocally bound to assume the net liabilities of the acquired thrifts: $305.67 million in its acquisition of Southeastern, $314.63 million in its acquisition of Brentwood, and $17.74 million in its acqui-

sition of Family. It is clear from the documents that this was the intent of the parties. As we held in *Winstar II,* "[i]f the parties did not intend to use supervisory goodwill for regulatory capital purposes there would simply be no reason for the extensive negotiations and the conditions regarding its use." *Winstar II,* 64 F.3d at 1542. "Once specific terms as to the amount of supervisory goodwill and its amortization periods under that regulatory policy were incorporated in a negotiated arm's length contract, both parties were bound to them." *Id.*

We have already answered the question of whether the FHLBB and the FSLIC have the authority to enter into contracts like these in the affirmative. *Id.* at 1548. Since its inception, the FSLIC has had the authority under 12 U.S.C. § 1725(c)(3) to make contracts. *Id.* Further, both the FSLIC and its supervisory agency, the FHLBB, have had "the authority both to extend assistance to acquirers of insolvent FSLIC-insured thrifts, 12 U.S.C. § 1729(f)(2)(A) (repealed), and to set minimum capital limits on a case-by-case basis, 12 U.S.C. § 1730(t)(2) (repealed)." *Id.*

In *Winstar III,* the Supreme Court recognized that the issue of whether there was a contract between the thrifts and the government was not strictly before it, 518 U.S. at 860, 116 S.Ct. 2432, but did not doubt this court's conclusion that the "overall 'documentation in the Winstar transaction establishes an express agreement allowing Winstar to proceed with the merger plan approved by the [FHLBB], including the recording of supervisory goodwill as a capital asset for regulatory capital purposes to be amortized over 35 years.'" 518 U.S. at 865–66, 116 S.Ct. 2432 (quoting *Winstar II,* 64 F.3d at 1544). Just as in *Winstar III,* all of the necessary elements of contract formation are present

here, and the parties are bound by the terms of that contract.

■ The government further argues that, even if there were contracts in the Brentwood and Family transactions, their term was limited to five years by the net worth forbearances. These allowed Cal Fed to be considered in compliance with its reserve and net worth requirements to the extent that any noncompliance is due to (a) operating or capital losses on acquired assets, (b) the amount of net liabilities of the acquired thrift, or (c) other items solely attributable to the acquisition. Because these five-year agreements expired prior to the passage of FIRREA, the government argues that FIRREA and its regulations did not breach any contracts with Cal Fed.

Notably, the government did not claim that the expiration of the net worth forbearances barred the inclusion of supervisory goodwill for regulatory capital purposes until the common issue proceedings that led to the instant summary judgment of liability in 1997. The Court of Federal Claims agreed with the PCC that two of the three *Winstar* test cases involved forbearance letters issued by the FHLBB that contained net worth forbearances similar, if not identical, to those now at issue. *Cal. Fed. I,* 39 Fed.Cl. at 760. In those cases, the Supreme Court allowed amortization of goodwill over the entire period authorized by the forbearances and not merely for the five-year term of the net worth forbearances. *Winstar III,* 518 U.S. at 864–66, 116 S.Ct. 2432. These contracts permitting special accounting treatment of supervisory goodwill were breached by FIRREA and its regulations. *Id.* at 866, 116 S.Ct. 2432. We view the five-year expiration provision as relating only to the net worth forbearances that barred the FHLBB from enforcing its capital requirements for five years to the extent that any violation of those require-

ments was traceable to the subject acquisitions. The terms of the forbearance letters permitting the amortization over 35 to 40 years were separate and apart from the five-year enforcement-related terms. In any event, the five-year expiration provision of the net worth forbearances does not negate other obligations under the merger plan, including the specific time periods for amortization of goodwill. *Winstar II,* 64 F.3d at 1542.

■ As shown by the documentary evidence for the Brentwood and Family transactions, this long-term amortization of goodwill was a central consideration in Cal Fed's acquisitions. The documentary evidence for both the Brentwood and Family transactions demonstrates that purchase accounting and amortization of goodwill were essential terms of the negotiated transactions. There is no factual dispute concerning these documents, and they are precisely the type of evidence relied upon by the *Winstar* courts to establish the existence of contracts between acquiring thrifts and the government. Therefore, the government's breach of that contractual promise was substantial and material.

## II.

We now turn to the matter of damages for the government's breach. Cal Fed sought expectancy damages in the form of lost profits from the forced shrinkage of its assets to reestablish capital compliance, and reimbursement for the cost of replacing the capital previously provided by the supervisory goodwill with cash. Cal Fed additionally requested restitution of the benefit it had conferred on the government by assuming the net liabilities of the acquired thrifts. Finally, it sought reliance damages in the form of wounded bank damages allegedly incurred as a result of the government's withdrawal of the right

to use supervisory goodwill as regulatory capital.

■ "One way the law makes the non-breaching party whole is to give him the benefits he expected to receive had the breach not occurred." *Glendale*, 239 F.3d at 1380 (citing Restatement (Second) of Contracts § 344(a) (1981)). "The benefits that were expected from the contract, 'expectancy damages,' are often equated with lost profits, although they can include other damage elements as well." *Id.* (citing Restatement (Second) of Contracts § 347). Lost profits are "a recognized measure of damages where their loss is the proximate result of the breach and the fact that there would have been a profit is definitely established, and there is some basis on which a reasonable estimate of the amount of the profit can be made." *Neely v. United States*, 152 Ct.Cl. 137, 285 F.2d 438, 443 (1961).

■ According to *Wells Fargo v. United States*,

"If the profits are such as would have accrued and grown out of the contract itself, as the direct and immediate results of its fulfillment, then they would form a just and proper item of damages, to be recovered against the delinquent party upon a breach of the agreement. . . . But if they are such as would have been realized by the party from other independent and collateral undertakings, although entered into in consequence and on the faith of the principal contract, then they are too uncertain and remote to be taken into consideration as a part of the damages occasioned by the breach of the contract in suit."

88 F.3d 1012, 1022–23 (Fed.Cir.1996) (quoting *Ramsey v. United States*, 121 Ct. Cl. 426, 101 F.Supp. 353 (1951)). The subject of the contract between Cal Fed and the government was Cal Fed's assumption of the net liabilities of the acquired thrifts in exchange for the promised favorable regulatory treatment. The continued use of supervisory goodwill as regulatory capital for the entire 35–40 year amortization period initially promised was therefore a central focus of the contract and the subject of the government's breach. Profits on the use of the subject of the contract itself, here supervisory goodwill as regulatory capital, are recoverable as damages. *Id.*

Following pretrial hearings on expectancy damages generally, the trial court directed Cal Fed to submit "a concise list of lost profits claimed, along with reference to [written business plans, board resolutions and minutes, and internal memoranda] that will support such credits." *Cal. Fed. II*, 43 Fed.Cl. at 457. After reviewing the response to this order, along with a lengthy appendix that consisted mostly of business plans and related data, the Court of Federal Claims ruled that Cal Fed would not be able to establish lost profits as a matter of law. *Id.*

Cal Fed alleges that the government's breach eliminated about half of its regulatory capital, forced it to sell $4 billion of highly profitable assets, required it to forego making highly profitable loans, prevented it from leveraging the goodwill into earning assets, and increased its costs. Cal Fed presented documentary evidence to show that it sold significant assets in the wake of the breach. Its business plans and Office of Thrift Supervision documents allegedly showed its intent to invest in low risk assets that it claims have proven profitable. It provided specific documentation of 24,664 single-family adjustable rate mortgages worth approximately $4 billion that it claims it was forced to sell to remain in capital compliance after the breach. Cal Fed then provided expert testimony, which traced the actual post-sale performance of these

loans and arrived at lost profits of $317 million attributable to those sales. Additional documentary and deposition evidence was submitted to support Cal Fed's claim that in 1993 it was forced to sell a profitable business unit, California Thrift & Loan, to meet its capital requirements. It claimed the sale resulted in lost profits of $44 million. Cal Fed offered evidence of its past performance, its pre-breach business plans, data on the performance of other thrifts in the post-breach period, and historical evidence of assets that it allegedly had to sell to remain in capital compliance.

"If a reasonable probability of damage can be clearly established, uncertainty as to the amount will not preclude recovery." *Locke v. United States,* 151 Ct.Cl. 262, 283 F.2d 521, 524 (1960). The Supreme Court held in *Winstar III* that goodwill promises "allow[ed] the thrift to leverage more loans (and, it hoped, make more profits)." *Winstar III,* 518 U.S. at 851, 116 S.Ct. 2432. The trial court correctly observed that the government "knew that breaching this agreement would cause [Cal Fed] to adjust its capital ratio. That is, it knew that [Cal Fed] would have to reduce its assets or increase its capital." *California Fed. Bank v. United States,* No. 92–138 C (Fed.Cl. Nov. 12, 1998) (Order). Both the existence of lost profits and their quantum are factual matters that should not be decided on summary judgment if material facts are in dispute. R. Ct. Fed. Cl. 56(c). Cal Fed submitted considerable evidence, including documents and expert testimony, that more than sufficed to create a genuine issue of material fact as to the existence and quantum of lost profits. The Court of Federal Claims erred by not permitting Cal Fed to present its evidence at a trial based on its legal conclusion that the proof would be too speculative. We therefore vacate the summary judgment on lost profits and remand for trial on the issue.

■ Second, Cal Fed requested the cost of replacing the capital that formerly had been supplied by supervisory goodwill. Following trial on that issue, the Court of Federal Claims granted replacement costs for the transaction costs associated with various stock transactions Cal Fed used to replace the goodwill that was phased out by the breach. Cal Fed argues that this award was legally flawed because it failed to credit the true economic value of goodwill as a tool to leverage into earning assets and erroneously measured the replacement cost damages "on the day the stock is issued." This leverage argument is more appropriately applied to Cal Fed's claim for lost profits, which will be the subject of a new trial on remand. At trial, the Court of Federal Claims considered the conflicting testimony on the measurement of capital replacement costs by the parties' experts. The government's expert, Merton Miller, a Nobel Laureate in Economic Science, testified that the cost of replacing goodwill was floatation costs because the value of the cash proceeds of Cal Fed's newly-raised capital equaled the cost of future dividends. The court found Cal Fed's experts not credible. It discounted their testimony that the cost of replacing $390 million of goodwill was nearly a billion dollars, based in part on the cost of repurchasing all outstanding stock by Cal Fed to eliminate the cost of paying dividends. We see no clear error in the court's factual finding that the floatation costs provided an appropriate measure of Cal Fed's damages incurred in replacing the supervisory goodwill with tangible capital.

■ The idea behind restitution is to restore the non-breaching party to the position it would have been in had there never been a contract to breach. *Glendale,* 239 F.3d at 1380 (citing *Acme Process Equip. Co. v. United States,* 171 Ct.

Cl. 324, 347 F.2d 509, 528 (1965)). Cal Fed argued below that it was entitled to restitution equal to the benefit conferred upon the government by the Southeastern and Brentwood mergers. The Family transaction is not included in the restitution claim. The value of that benefit, it argued, should be calculated by taking each of the acquired thrift's obligations or debts at the time the contract was made, and subtracting from it the thrift's then-assets, and then summing the results for Southeastern and Brentwood. Cal Fed claims that the resulting figure, a negative $620 million, represents the amount that the government benefited from the contract. It argues that while the benefit should be measured at the time of the respective mergers, it is appropriate to offset the resulting benefit by Cal Fed's earnings from the transactions, which it claims to be $211 million. Cal Fed therefore claims that it is entitled to $409 million as restitutionary damages. The government argues that Cal Fed conferred no such benefit because the FSLIC continued to possess a contingent liability to the depositors of Cal Fed and the acquired thrifts that was unchanged by the acquisitions, and that under no scenario at the date of the acquisitions would Cal Fed have ever paid the net liabilities. The government asserts that either interest rates would have fallen, erasing the net liabilities (as they did), or, if interest rates remained high, Cal Fed would have failed and the FSLIC would have been forced to make good on its contingent commitments to insure the affected depositors. The Court of Federal Claims denied restitutionary relief because Cal Fed had not been harmed by its assumption of the assets and liabilities of the failing thrifts it acquired.

We addressed a nearly identical claim for restitution in *Glendale*, 239 F.3d at 1381–82. There we rejected arguments akin to those now advanced by Cal Fed and the government as flawed.

In the first place, it is clear that the Government's promise that was breached had substantial value.... Whether viewed as a grant of a special bookkeeping procedure for these cases, or as a promise to waive the regulatory requirement on capital reserves for a specified number of years, there can be no doubt that, for a banker interested in purchasing a failing thrift, the promise was of substantial value toward accomplishing that goal....

At the same time, the action taken by the purchasing S & L in acquiring the failing thrift did not result in the Government, specifically the FSLIC, saving the dollar value of the net obligations of the thrift.... In a very real sense, what the Government received in exchange for its promise was time—time to deal with other failing S & Ls, time to see what the market would do before having to commit substantial resources to the problem. Though the value of time was more than zero, there is no proof of what in fact it was worth.

*Id.* We cited the contingent liability of the FSLIC and the possibility that Glendale and the acquired thrifts might have failed had interest rates not fallen. *Id.* at 1382. In light of those circumstances, we concluded that that case

present[ed] an illustration of the problem in granting restitution based on an assumption that the non-breaching party is entitled to the supposed gains received by the breaching party, when those gains are both speculative and indeterminate. We do not see how the restitution award granted by the trial court, measured in terms of a liability that never came to pass, and based on a speculative assessment of what might have been, can be upheld; accordingly we vacate the trial court's damage award on this theory.

*Id.* There is no meaningful difference between the restitution claims in this case and *Glendale.* We do not fault the Court of Federal Claims' denial of restitution damages.[1]

### Conclusion

Accordingly, the judgment of the United States Court of Federal Claims is affirmed-in-part, vacated-in-part, and the case is remanded for further proceedings consistent with this opinion.

### COSTS

Each party shall bear its own costs.

*AFFIRMED–IN–PART, VACATED–IN–PART, AND REMANDED.*

---

1. Before the trial court, Cal Fed requested wounded bank damages resulting from the government's withdrawal of the right to use supervisory goodwill as capital, which Cal Fed claims placed it in a precarious financial position and was responsible for costs that it would not otherwise have incurred. These alleged costs included higher costs of deposits because of customer concern, higher assessment fees charged by regulators, and higher borrowing costs. The court denied wounded bank damages because Cal Fed failed to establish that the government's breach caused those financial difficulties. On this appeal, Cal Fed does not challenge that ruling.