**COLUMBIA FIRST BANK, FSB, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 95–510 C.

United States Court of Federal Claims.

Dec. 17, 2002.

---

Mary C. Gill, Atlanta, GA, for plaintiff. William T. Plybon and Craig H. Kuglar, Atlanta, GA, of counsel.

Brian L. Owsley, with whom were Stuart E. Schiffer, Deputy Assistant Attorney General, David M. Cohen, Director, and Jeanne E. Davidson, Deputy Director, United States Department of Justice, Washington, DC, for defendant. Gary Dernelle, Washington, DC, of counsel.

## OPINION

HEWITT, Judge.

Plaintiff (Columbia First) in this action seeks damages arising out of the passage of the Financial Institutions Reform, Recovery and Enforcement Act of 1989 (FIRREA), Pub.L. No. 101–73, 103 Stat. 183, and the resulting breach of its Assistance Agreement with the Federal Home Loan Bank Board (FHLBB). Plaintiff filed its Complaint on August 7, 1995, and on April 16, 2002 the government conceded on the issue of liability.[1] Joint Stipulation filed April 16, 2002 (Joint Stip.).[2]

---

1. The case was reassigned to Judge Hewitt on February 1, 2002, after completion of the early stages of the litigation.

2. Specifically, it was conceded "[t]hat the Court [sic] may enter summary judgment on liability, i.e., the existence of a contract and action by the Government inconsistent with that contract in conjunction with Columbia First's acquisition of Family Federal Savings and Loan Association, Springfield, Virginia, as alleged in the Complaint ...." Joint Stip. ¶ (a).

Now before the court is Defendant's Motion for Summary Judgment Upon Plaintiff's Damages Claims (Def.'s Mot.). The motion has been fully briefed and argued.

Defendant argues that plaintiff incurred no damages as a result of the passage of FIRREA. Def.'s Mot. *passim*. Defendant contends that plaintiff cannot use a "cost of replacement" model to recover the supervisory goodwill[3] lost as a result of FIRREA because those costs are hypothetical and not actually incurred. *Id.* at 16. Defendant also argues that plaintiff's decision not to replace the supervisory goodwill was itself a form of mitigation barring any other recovery based on a theory of mitigation, specifically, plaintiff's "cost of replacement" damages. *Id.* at 16–17. Defendant argues that plaintiff is barred from recovering lost profits because the model employed by plaintiff is fatally speculative and its claimed lost profits were not reasonably foreseeable. *Id.* at 30–33. Finally, defendant contends that plaintiff's loss of key documents in this case (spoliation) forecloses any recovery it may be entitled to for lost profits. *Id.* at 24–30.

Plaintiff argues that defendant cannot meet the standard for summary judgment in this case. Plaintiff Columbia First Bank's Opposition to Defendant's Motion for Summary Judgment Upon Plaintiff's Damages Claims (Pl.'s Opp.) *passim*. First, plaintiff contends that it is not precluded from recovering the cost of replacing its lost supervisory goodwill merely because it did not actually replace the goodwill in the real world. *Id.* at 25–26. Plaintiff also argues that lost profits were foreseeable at the time of contract. *Id.* at 12–17. Plaintiff argues that its expert's testimony and other evidence create a question of material fact about the amount of its

claimed lost profits which can only be resolved at trial. *Id.* at 18. As to spoliation, plaintiff argues that bad faith is necessary to dismiss a claim based on the loss of key documents, and that bad faith has not been shown in this case. *Id.* at 37. And, plaintiff contends, even if there was bad faith, the government was not prejudiced by its inability to retrieve those documents. *Id.* at 38.

For the following reasons, defendant's Motion for Summary Judgment is GRANTED in part and DENIED in part.

## I. Background[4]

In the mid 1980s, Family Federal Savings and Loan (Family) was a textbook example of a failing thrift. The thrift had been insolvent since April of 1982 and had continued to experience losses thereafter. Plaintiff's Appendix to Opposition to Defendant's Motion for Summary Judgment Upon Plaintiff's Damages Claims (Pl.'s App.) at 295; Appendix to Defendant's Motion for Summary Judgment Upon Plaintiff's Damages Claims (Def.'s App.) at 176, 183–84. In order to avoid an estimated cost to the government of $26.6 million to liquidate the thrift, the Federal Savings and Loan Insurance Corporation (FSLIC) solicited proposals from prospective buyers. Pl.'s App. at 297.[5] On June 20, 1985, Columbia First submitted its proposal to take over the failing thrift. Pl.'s App. at 296.

On September 27, 1985, plaintiff acquired Family in an assisted supervisory transaction pursuant to a contract with the FHLLB and the FSLIC. Defendant's Proposed Findings of Uncontroverted Facts (DPFUF) ¶ 1; Def.'s App. at 111, 569. At the time of purchase, Family had been insolvent for over

---

3. Supervisory goodwill is an intangible asset which was, prior to FIRREA, used in calculating a thrift's regulatory capital and satisfying its minimum regulatory capital requirements. *See United States v. Winstar Corp.*, 518 U.S. 839, 848–51, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996). Regulatory capital refers to the amount of capital that thrifts were required to maintain. *Winstar Corp. v. United States*, 64 F.3d 1531, 1535 (Fed.Cir. 1995) (en banc), *aff'd* 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996). Generally, the required amount of capital was a certain percentage of the thrift's total assets. *United States v. Winstar Corp.*, 518 U.S. at 857, 116 S.Ct. 2432.

4. The financial environment that led to the savings and loan bailouts has been fully described in many cases. *See, e.g., United States v. Winstar Corp.*, 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996) (plurality opinion).

5. The facts relied on in this opinion and cited to only one of the parties' Proposed Findings of Uncontroverted Fact or other filings do not appear to be in dispute.

three years. Pl.'s App. at 295; Def.'s App. at 111. Columbia First was able to purchase Family without expending any of its own cash. DPFUF ¶ 2. For plaintiff, the key elements of the acquisition included: "(a) the FSLIC's purchase from Columbia First of a $15.0 million Permanent Income Capital Certificate ('PICC'), which would be included in the Bank's regulatory capital, in exchange for a $15.0 million ten-year promissory note issued by the FSLIC; (b) the transaction would be accounted for as a purchase with the resulting goodwill to be included in regulatory capital on a straight-line amortizing basis for a period up to 40 years; and, (c) Columbia First would be authorized to branch in Virginia." Pl.'s Opp. at 2; *see also* Def.'s App. at 112–13; Pl.'s App. at 296–97. Because plaintiff was able to record supervisory goodwill of $21 million as a result of the transaction, Pl.'s App. at 297, Def.'s App. at 1369, its regulatory capital after the acquisition exceeded the then applicable regulatory net worth requirement by $19.5 million. Pl.'s App. at 297.

In August 1989, FIRREA was signed into law. Section 301 of FIRREA disposed of the concept of regulatory net worth and imposed certain levels of tangible capital, core capital, and risk-based capital. 12 U.S.C. § 1464(t)(2)(A), (C); *see* Def.'s App. at 676; Pl.'s Opp. at 4. Thrift institutions were thereafter required to maintain tangible capital at a level of at least 1.5% of total assets, and were required to maintain core capital at a level of at least 3% of total assets. 12 U.S.C. § 1464(t)(2)(A), (B). Further, any supervisory goodwill was required to be phased out over a five-year period. 12 U.S.C. § 1464(t)(3)(A). The change in the treatment of supervisory goodwill constituted the breach of Columbia First's assistance agreement, which permitted amortization of supervisory goodwill over various time periods, ranging from 12 to 25 years. Complaint ¶ 28; Joint Stipulation ¶ (a); Def.'s App. at 1366–67.

Unlike many thrifts, Columbia First was able to survive in the post-FIRREA environment. Despite the government's breach, Columbia First never fell out of compliance with FIRREA's capital requirements. Transcript of October 30, 2002 Oral Argument (Tr.) at 46; DPFUF ¶ 44. At oral argument, plaintiff stated that "[t]his was a well run bank, and they did the best they could under the circumstances." Tr. at 46. Further, in press releases and its annual reports, Columbia First characterized its capital base as strong in comparison with other thrifts. DPFUF ¶¶ 42–43; Plaintiff's Response to Defendant's Proposed Findings of Uncontroverted Facts in Connection with Defendant's Motion for Summary Judgment Upon Plaintiff's Damages Claims (PPFUF) ¶ 42. By 1995, Columbia First was healthy enough to be purchased by First Union National Bank (First Union). *See* Tr. at 71.

In 1995, plaintiff began gathering documents in anticipation of litigation. DPFUF ¶ 47. Plaintiff eventually collected 31 boxes of documents, which were retained at First Union headquarters. *Id.* at ¶ 49. The boxes were put in an empty cubicle at First Union's headquarters in March of 1997, with labels identifying them as "legal confidential work product." *Id.* at ¶¶ 49, 53. The custodian of the boxes was located one floor below the cubicle. *Id.* at ¶ 53. In March of 1998, the custodian left First Union. *Id.* In the summer of 1998, First Union discovered that the boxes were missing. *Id.* at ¶¶ 53–54. None of the boxes has been found, and First Union believes they may have been destroyed. *Id.* at ¶ 54.

## II. Discussion

### A. Summary Judgment

Summary judgment is warranted when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Rules of the United States Court of Federal Claims (RCFC) 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact that might significantly affect the outcome of the litigation is material. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. Disputes over facts that are not outcome determinative will not preclude the entry of summary judgment. *Id.* at 247–48, 106 S.Ct. 2505.

The party moving for summary judgment bears the initial burden of demonstrating the absence of any genuine issues of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party demonstrates an absence of a genuine issue of material fact, the burden then shifts to the non-moving party to show that a genuine issue exists. *Sweats Fashions, Inc. v. Pannill Knitting Co.,* 833 F.2d 1560, 1563 (Fed.Cir.1987). The movant is also entitled to summary judgment if the non-movant fails to make a showing sufficient to establish an element of its case on which it will bear the burden of proof at trial. *Celotex,* 477 U.S. at 322–23, 106 S.Ct. 2548. The court must resolve any doubts about factual issues in favor of the party opposing summary judgment. *Litton Indus. Prods., Inc. v. Solid State Sys. Corp.,* 755 F.2d 158, 163 (Fed.Cir.1985), to whom the benefits of all favorable inferences and presumptions run. *H.F. Allen Orchards v. United States,* 749 F.2d 1571, 1574 (Fed.Cir.1984), *cert. denied,* 474 U.S. 818, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985).

### B. Hypothetical Cost of Replacement Damages

■ Plaintiff in this case attempts to recover damages equal to the cost of replacing its lost goodwill as of the date of the breach. To this end, plaintiff's expert has calculated amounts required to replicate the government's regulatory capital promises as of December 1989. Pl.'s App. at 312. Plaintiff's expert assumes that Columbia First issues hypothetical securities in return for the cash necessary to replace the amount of unamortized supervisory goodwill as of December 1989. *Id.* The cash from the sale of the securities is then assumed to be invested in Treasury securities with the income stream generated by the Treasury securities used as a partial offset of the cost of the plaintiff's hypothetically issued securities. *Id.* at 313. According to plaintiff, the replacement cost measure of damages would restore the Bank to its pre-breach capital position. *Id.* at 312.

Defendant argues that this "hypothetical 'cost of replacement' model is contrary to law—and basic fairness—because it seeks to recover expenses that were never incurred." Def.'s Mot. at 16. Defendant contends that plaintiff's failure to replace the goodwill lost as a result of the passage of FIRREA effectively serves as a full mitigation of any damages resulting from the loss of the goodwill. *Id.* at 18.

Defendant also argues that plaintiff's "mitigation"—its strategy of not replacing its lost goodwill with capital—precludes it from recovering damages on this claim. According to defendant, "[I]t is well-settled that a breach of contract plaintiff may recover only for undertaking the least expensive means of mitigating its damages." *Id.* at 17–18. Hence, " '[The law] precludes rewarding a plaintiff for undertaking a form of mitigation that is considerably more costly than other available means of mitigation.' " *Id.* at 18 (quoting *LaSalle Talman Bank, F.S.B. v. United States,* 45 Fed.Cl. 64, 111 (1999)). Here, the least expensive form of mitigation was the one plaintiff chose—not replacing goodwill. *Id.* As this is the course plaintiff decided to take, it cannot now recover additional damages based on a hypothetical, and more expensive, form of mitigation. *Id.* Defendant argues that this court and the Federal Circuit have repeatedly refused to award hypothetical cost of replacement damages, *see id.,* relying on *Bank United of Texas, F.S.B. v. United States,* 50 Fed.Cl. 645 (2001) and *Landmark Land Co. v. United States,* 46 Fed.Cl. 261 (2000), *aff'd in part, reversed in part,* 256 F.3d 1365 (Fed.Cir.2001).

In *Bank United,* the court rejected a model for hypothetical cost of replacement damages similar to those sought by plaintiff here. 50 Fed.Cl. at 656. Defendant points out that both *Bank United* and the current case used a hypothetical preferred stock issuance assuming the investment of funds in government bonds, resulting in a similar hypothetical percentage of recovery. *See* Def.'s Mot. at 19 (citing *Bank United,* 50 Fed.Cl. at 656). Defendant further points out that the court in *Bank United* found that "[t]he [hypothetical] model fails to consider the nature and limited extent of the breach impacts upon [the thrift] ...." Def.'s Mot. at 20 (citing *Bank United,* 50 Fed.Cl. at 656).

Defendant does not acknowledge the distinctions between *Bank United* and the case at hand, however. Most importantly, the court in *Bank United* had used other means to mitigate its damages, and awarded damages based on those facts. 50 Fed.Cl. at 664–65. The plaintiff in *Bank United* converted its subordinated debt in 1990 and issued preferred stock in 1992. *Id.* at 665. The court noted that plaintiff was entitled to "proven costs of what would reasonably have been incurred to mitigate," i.e., hypothetical replacement costs. *Id.* at 656. Hypothetical replacement costs were not awarded because the model reflected costs well in excess of what plaintiff actually expended and could not, in the court's view, be characterized as reasonable. *Id.* On those facts, it was impossible for the court to award hypothetical mitigation cost damages when actual mitigation cost damages were proven.

Defendant also relies on *Landmark*, which resembles the current case in that the plaintiff incurred *no* actual mitigation costs. Def.'s Mot. at 20. In *Landmark*, the plaintiff used a model similar to plaintiff's here to compute hypothetical replacement costs. *Landmark*, 46 Fed.Cl. at 273. The *Landmark* plaintiff had been unable to raise additional capital and the thrift failed within two years of the passage of FIRREA. *Id.* at 274. There was no testimony that the loss of goodwill caused the thrift to fail, or that any actual replacement costs were incurred. *Id.* Under these circumstances, the court stated:

> We found [plaintiff's expert's] model to be more persuasive than others that we have heard used in similar cases before this court. But his costs are theoretical as applied to the facts here. They provide a measure of damages that [the thrift] might have incurred had it chosen to replace the goodwill that was phased out according to the requirements of FIRREA. This did not happen though.

*Id.* Defendant argues that, based on persuasive authority, plaintiff is limited in its recovery to the transaction costs it would have incurred if it had actually replaced the goodwill. Def.'s Mot. at 20 (citing *Landmark*, 46 Fed.Cl. at 274).

Plaintiff counters that "[t]he government's argument misconstrues the facts and reasoning of these decisions," and that, in fact, the case law supports its application of a hypothetical cost of replacement model. Pl.'s Opp. at 25. In support of its argument, plaintiff relies primarily on *LaSalle Talman*, 45 Fed.Cl. 64 and *Glass v. United States*, 47 Fed.Cl. 316 (2000), *vacated*, 258 F.3d 1349 (Fed.Cir.2001).

In *LaSalle*, hypothetical replacement damages were found to be inapplicable, but only because the plaintiff there mitigated damages using other means. *See* 45 Fed.Cl. at 103. The *LaSalle* court stated:

> If this suit had been commenced and tried earlier—i.e., before the ABN·AMRO acquisition with all its subsequent benefits— then resort to a hypothetical model might make sense. But even then, defendant would only be liable for reasonable mitigation. Going out of business may have cost less than locking in an obligation to pay unrealistically high returns on preferred stock. But it is particularly inappropriate to resort to a hypothetical and unreasonably expensive method of replacing capital when the record shows the actual method of mitigation chosen by Talman. Accordingly, plaintiff's damages should be calculated on the basis of the actual means by which it filled its capital deficit . . . .

*LaSalle*, 45 Fed.Cl. at 103. According to plaintiff, "*LaSalle Talman* thus confirms that resort to a hypothetical model makes sense where the bank did not replace its supervisory goodwill with capital in the real world, as presented by the facts of this case." Pl.'s Opp. at 25.

While some of the language in the *LaSalle* decision may be helpful to plaintiff, it is, as defendant points out, dicta, and it is difficult to distinguish *LaSalle* from *Bank United*, on which defendant relies. *LaSalle* provides little support for plaintiff's position in this case.

Plaintiff argues that *Glass* is even more closely on point, in that the court found that hypothetical replacement costs were the proper measure of damages. Pl.'s Opp. at

25.[6] In *Glass*, the thrift in question was put into receivership soon after FIRREA was passed, 47 Fed.Cl. at 319, and was therefore unable to replace its lost goodwill. The thrift used a hypothetical cost of replacement model as a basis for its damages claim. *Id.* at 328. The trial court found that the hypothetical cost was a proper measure of damages, stating:

> It is the determination of damages that requires the replacement of goodwill .... There is cost involved when something is replaced. The model must account for that. [Plaintiff's] right to use supervisory goodwill on its books was taken away by FIRREA. Damages are sought to replace that asset. Those damages cannot be calculated without accounting for the cost of replacement. Having the use of the asset and getting the cash flow it represented on the books again, is essential in valuing the asset. The transaction costs are hypothetical as is the entire model. The model represents damages, a value calculation for the usefulness of something that was contracted for, not an actual transaction.

*Id.* at 328–29.

The *Glass* case provides the alternative view to *Landmark*, but is similarly inapplicable to this case. Where the thrift in *Glass* failed, making it impossible to raise capital to replace the lost goodwill, *id.* at 328, here plaintiff chose not to raise capital. *See* Def.'s App. at 459–60; 531–33.

The Restatement of Contracts states that "damages are not recoverable for loss that the injured party could have avoided without undue risk, burden or humiliation." Restatement (Second) of Contracts: Avoidability as a Limitation on Damages § 350 (1981). The rationale behind this rule is to encourage the injured party to attempt to avoid loss. *Id.*, cmt. a. Usually, mitigation is used by the breaching party as a shield in an attempt to limit recovery when the injured party does nothing to mitigate. *See, e.g., Koby v. United States,* 53 Fed.Cl. 493, 496–97 (2002). Here, however, the rule is being used by the breaching party as a sword to limit the re-

covery of a plaintiff who did mitigate reasonably and effectively. The basic principles of the mitigation analysis remains the same, however; "the court [must] consider whether a reasonable person, acting in light of the known facts and circumstances, would have taken steps to avoid certain damages." *Koby,* 53 Fed.Cl. at 497. In this case, it appears that plaintiff did take reasonable steps to avoid damages. *See* Tr. at 46.

The fact that there is a factual dispute concerning whether the plaintiff "chose" not to replace the lost goodwill, as defendant argues, or whether plaintiff was constrained by the economic conditions of the time and could not raise capital, as plaintiff contends, *compare* Def.'s Mot. at 16–17 *with* Pl.'s Opp. at 27–28, is, the court believes, irrelevant to the court's conclusion. Both the breach and the economic conditions were the realities plaintiff faced and the decision to forego raising capital was a business decision designed to address both. In this case, plaintiff both behaved reasonably and did not incur the cost of replacing capital. *See* Tr. at 46. Plaintiff may have been damaged, and even badly damaged, by the breach, but that damage was neither caused nor increased by mitigation costs, and the court sees no reason to use hypothetical mitigation costs as a measure of damages now.

As part of its cost of capital replacement model, plaintiff also seeks $4.4 million to "compensat[e]" the plaintiff for the lost use of the money for the intervening period." Def.'s Mot. at 24; Def.App. at 395. This amount was computed by calculating interest at five percent on the amount being sought as the cost of replacement. Def.'s Mot. at 24; Def.App. 395. Defendant argues that this recovery is barred by the prohibition on prejudgment interest in *Winstar* related cases. Def.'s Mot. at 24. As defendant points out, plaintiff does not address this point in its opposition to summary judgment. Defendant's Reply Brief to Plaintiff's Opposition to Summary Judgment Upon Plaintiff's Damages Claims (Def.'s Reply) at 8 n. 1. Defendant is entitled to summary judgment

---

6. *Glass* was reversed and remanded on the issue of liability with respect to the shareholder's contract claims and vacated with respect to the standing of the FDIC to bring suit. 258 F.3d 1349 (Fed.Cir.2001).

**700**

on plaintiff's claim for the hypothetical cost of capital replacement, including, *a fortiori*, its claim for interest on that hypothetical claim.

### C. Lost Profits

■ Plaintiff also claims damages for its lost profits resulting from the government's breach. Pl.'s App. at 308. To calculate these damages, plaintiff's expert determined the difference between plaintiff's actual earnings in each year and the actual earnings plaintiff would have achieved but for the breach. *Id.* According to plaintiff, the breach interfered with its growth plans, resulting in lost profits amounting to $6.8 million. *Id.* at 309.

Defendant argues that plaintiff's lost profits claim is barred as a matter of law. Def.'s Mot. at 30–40. Defendant relies primarily on the Federal Circuit's decision in *Wells Fargo Bank, N.A. v. United States*, 88 F.3d 1012 (Fed.Cir.1996), *cert. denied*, 520 U.S. 1116, 117 S.Ct. 1245, 137 L.Ed.2d 328 (1997), to support its argument.

While *Wells Fargo* is not a *Winstar*-type case, it does involve the loss of regulatory capital and thus is relevant to the case at hand. In *Wells Fargo*, the refusal of the government to guarantee a loan resulted in the bank charging off $9.7 million. *Id.* at 1022. This was claimed to have impacted the bank's ability to make new loans, and therefore limited the profits that could be gained from those loans. *Id.*

The Federal Circuit found that these lost profits were not recoverable. *Id.* The court stated that "Wells Fargo's loss of interest on additional loans it allegedly could have made had there been no breach is 'too uncertain and remote to be taken into consideration as a part of the damages occasioned by the breach of the contract in suit.'" *Id.* at 1023. This is because "remote and consequential damages are not recoverable in a common-law suit for breach of contract .... especially ... in suits against the United States for the recovery of common-law damages, such as the instant case." *Id.* at 1021 (citing *Northern Helex Co. v. United States*, 207 Ct.Cl. 862, 524 F.2d 707, 720 (1975)).

Defendant argues that "[b]ecause Columbi[a First]'s lost profits were neither reasonably certain nor reasonably foreseeable, *Wells Fargo* mandates that its speculative damages claim be dismissed." Def.'s Mot. at 32. Defendant first argues that plaintiff's damages claims are too speculative because the projected lost profits are not causally related to the loss of goodwill and are based on a series of implausible assumptions.[7] *See id.* at 33, 35. Defendant also contends that plaintiff's projected lost profits are based on projected growth, rather than profitability. *Id.* at 34.

> If a purchaser is not concerned about the quality, pricing, or risks associated with an asset and funding liability, that purchaser could accumulate an enormous portfolio. The trick to succeeding, though, is not to acquire blindly any assets funded with any liabilities, but rather to analyze carefully the potential profitability and risks of each opportunity and seize only those that will yield the desired profits.

*Id.* at 34. According to defendant, plaintiff "ignores this last step and assumes that the most highly sought after assets could have

---

7. According to defendant, to award damages the court would have to evaluate multiple factors that are simply assumed by the plaintiff's model, including:

(1) Whether Columbia [First] would have levered its capital to the extent assumed to acquire or retain the alleged foregone assets?
(2) What types of foregone assets, if any, would Columbia [First] have, [sic] acquired or retained?
(3) What proportions of the various types of foregone assets would Columbia [First] have acquired or retained?
(4) What prices would Columbia [First] have paid for the alleged foregone assets, as well as

for assets it actually acquired in the real world?
(5) What revenues would Columbia [First] have received from its alleged foregone assets?
(6) What costs would Columbia [First] have paid to fund the acquisition of its alleged foregone and actual assets?
(7) What the competitive environment would have been like?
(8) Whether the foregone assets would have generated net profits as opposed to net losses?
*Id.* at 35–36. The court notes that some or all of the foregoing may be helpful to the court in testing plaintiff's damages model at trial.

been harvested risk-free and at will." *Id.* at 34–35. Defendant argues that operating in a more highly leveraged manner amplifies both potential profits and losses. *Id.* at 38. Therefore, defendant "could not have reasonably foreseen that just because Columbia [First] had an alleged right to operate in a more highly leveraged manner, it would have been 'reasonably certain' to earn more profits." *Id.*

Defendant also argues that the facts presented by plaintiff do not support such a claim. According to defendant, plaintiff cannot indicate which specific assets or liabilities it would have acquired but for the passage of FIRREA. *Id.* at 36; Def.'s App. at 396–98. Nor, according to defendant, can plaintiff indicate the amount of dollar volume of retail deposits and advances it would have had but for the passage of FIRREA. Def.'s Mot. at 36; Def.'s App. at 399–400. To provide such answers, defendant argues, would require speculation that is precluded by *Wells Fargo.* *See* Def.'s Mot. at 36.

Plaintiff argues that lost profits were foreseeable here and such lost profits are not too speculative in this case. *See* Pl.'s Opp. at 15–17. Plaintiff argues that "[t]he Federal Circuit has expressly found that government regulators foresaw that the thrifts would utilize the supervisory goodwill created by the acquisitions to generate additional profits." Pl.'s Opp. at 13 (citing *California Federal Bank, F.S.B. v. United States,* 245 F.3d 1342, 1348 (Fed.Cir.2001) (*Cal.Fed.*)). Therefore, the lost profits "were on the use of the subject of the contract itself," and are recoverable. Pl.'s Opp. at 12 (citing *Neely v. United States,* 152 Ct.Cl. 137, 285 F.2d 438 (1961); *Chain Belt v. United States,* 127 Ct.Cl. 38, 115 F.Supp. 701 (1953)).

In further support, plaintiff quotes the familiar statement of the Federal Circuit in *Cal.Fed.:*

> The subject of the contract between Cal Fed and the government was Cal Fed's assumption of the net liabilities of the acquired thrifts in exchange for the promised favorable regulatory treatment. The continued use of supervisory goodwill as regulatory capital for the entire 35–40 year amortization period initially promised was

therefore a central focus of the contract and the subject of the government's breach. Profits on the use of the subject of the contract itself, here supervisory goodwill as regulatory capital, are recoverable as damages.

Pl.'s Opp. at 15 (quoting *Cal.Fed.,* 245 F.3d at 1349).

Plaintiff argues that not only are lost profits generally foreseeable in a case of loss of supervisory goodwill, but that they were foreseeable in this specific transaction. If the goodwill had not been included in Columbia First's books at the time of the transaction, it would have had a regulatory capital deficit of $1.14 million. Pl.'s Opp. at 15; Def.'s App. at 569; Pl.'s App. at 110–11. This would have led to the seizure of Columbia First. Pl.'s Opp. at 15–16. Plaintiff argues that, just as in *LaSalle Talman,* "the agreement would enable Columbia First to 'keep its doors open' and gave it 'additional opportunity to generate operating profits to the extent they could leverage net positive capital resulting from the addition of supervisory goodwill to their books.'" *Id.* at 16 (citing *LaSalle Talman,* 45 Fed.Cl. 64). Further, Columbia First was planning a conversion from mutual to stock form at the time of the transaction. *Id.* The government was aware of this conversion and was "aware that the use of the supervisory goodwill resulting from the Family transaction was necessary for a successful offering." *Id.;* Def.'s App. at 1282. According to plaintiff, defendant "knew without any doubt that Columbia First would seek to grow and leverage the goodwill that would be generated by the Family Federal transaction." Pl.'s Opp. at 16. The court agrees with plaintiff that lost profits should be regarded as foreseeable in the circumstances of this case because of the evident reliance of Columbia First on defendant's promise.

Plaintiff also argues that the evidence in the record is more than enough to create a genuine issue of material fact as to Columbia First's lost profits. *Id.* at 18. Plaintiff has presented testimony by Columbia First's Chief Financial Officer that Columbia First "felt ... restricted in many of the things that we otherwise would have done in terms of

growth." *Id.;* Pl.'s App. at 167. The Chief Executive Officer of Columbia First has testified in deposition that FIRREA "impacted the implementation of our business plan," and, in the five years following the enactment of FIRREA, that Columbia First " 'didn't have the capital' to 'fully execute our business plan of acquisition of deposits,' and felt capital constrained 'when we were trying to enlarge our market and acquire branches.' " Pl.'s Opp. at 19; Pl.'s App. at 225, 227, 233, 244. In its Verified Answers and Objections to Defendant's First Set of Phase II Case-Specific Interrogatories, plaintiff "identified a host of potential acquisitions Columbia First had to forego in the wake of FIRREA because of its precarious capital position." Pl.'s Opp. at 20. Plaintiff has also produced expert testimony that concludes that "Columbia First was harmed by the passage and implementation of FIRREA in a manner that eliminated the Bank's right to include its supervisory goodwill in the calculation of all measures of regulatory capital." *Id.* at 21; Pl.'s App. at 307. Based on the evidence in the record, that expert then determined the lost profits Columbia First would have earned but for the government's breach. Pl.'s Opp. at 21; Pl.'s App. at 292–352.

The Federal Circuit has stated that "[b]oth the existence of lost profits and their quantum are factual matters that should not be decided on summary judgment if material facts are in dispute." *Cal.Fed.,* 245 F.3d at 1350. In *Cal.Fed.,* plaintiff alleged that "the government's breach eliminated about half of its regulatory capital, forced it to sell $4 billion of highly profitable assets, required it to forego making highly profitable loans, prevented it from leveraging the goodwill into earning assets, and increased its costs." *Id.* at 1349. Plaintiffs there submitted "considerable evidence, including documents and expert testimony" in support of that allegation. *Id.* at 1350. Among the documentary and deposition evidence submitted was "evidence of its past performance, its pre-breach business plans, data on performance of other thrifts in the post-breach period, and historical evidence of assets that it allegedly had to sell to remain in capital compliance." *Id.*

Likewise, plaintiff in this case has presented substantial documentary, deposition, and expert evidence. The evidence includes financial documents, depositions from former officers detailing lost opportunities, and extensive expert reports detailing the sources of Columbia First's hypothetical lost profits and describing the methodology by which the expert conclusions were reached. In its opening brief, defendant attempted to distinguish this case from *Cal.Fed.* by arguing that here plaintiff "fails to identify a single profitable asset that the alleged breach caused Columbia [First] to sell or was precluded from owning, nor has [it] demonstrated any lost profits from those specific assets." Def.'s Mot. at 39. Notwithstanding that assertion, the court cannot find the absence of a genuine issue of material fact on this record. Therefore, summary judgment on the issue of lost profits is not appropriate in this case.

### D. Spoliation of Evidence

Defendant argues that plaintiff is not entitled to lost profits because it destroyed documents vital to this claim. Def.'s Mot. at 24–30. Defendant specifically argues that sanctions are appropriate if three elements are met: "(1) there was a duty to preserve the lost evidence; (2) evidence was lost due to a culpable breach of that duty; and (3) the non-breaching party was prejudiced by the loss of the evidence." *Id.* at 24–25. Defendant argues that all three elements are present in this case and that the only appropriate sanction is dismissal of the plaintiff's complaint. *Id.* at 25.

As to the element of the duty to preserve evidence, defendant argues that plaintiff was under a duty to preserve the documents it had gathered under the term's of the court's January 29, 1996 order. *Id.* In that order, Judge Hodges stated that:

It is important that no documents reasonably related to the issues in this case be destroyed while we await a [Winstar] ruling. The parties must vacate all routine record retention procedures that otherwise would apply. Such an obligation arose at the time the complaint was filed, and it continues until the case is resolved ....

Def.App. 13. The documents were not lost until sometime between March 1997 and August 1998, well after the court issued its order, and the duty to preserve those documents had attached. Def.'s Mot. at 25.

As to the element of culpable breach of duty, defendant argues that plaintiff culpably breached its duty when the "documents were lost because plaintiff failed to take reasonable measures to safeguard them." *Id.* at 26. The boxes of documents were placed in an empty cubicle with only tape to guard them. *Id.* at 25–26. This not only violated First Union's own retention policy, *see* Def.'s App. at 428–29, but plaintiff itself knew this security arrangement was inadequate. Def.'s Mot. at 26; Def.'s App. at 554. According to defendant, "[p]laintiff's actions (and inaction) thus constitute a culpable breach of its duty to preserve the evidence it had collected." Def.'s Mot. at 26.

As to the element of prejudice caused by the loss of these documents, defendant points out that the court noted in an earlier order, "Discovery needed for [damages calculations] presumably is in the plaintiff's hands." Def.'s App. at 12. Defendant argues that the law presumes prejudice where relevant evidence has been destroyed. Def.'s Mot. at 28 (citing *Kronisch v. United States,* 150 F.3d 112, 128 (2d Cir.1998)). Because plaintiff has admitted that the lost boxes contained documents "deemed to be important" that were relevant to the litigation, Def.'s App. at 502–03, defendant argues that prejudice should be presumed here. Def.'s Mot. at 29.

At oral argument, defendant further noted that the missing documents were of the type usually used by the government to defend *Winstar*-type cases. Tr. at 33. There are gaps in the asset/liability committee minutes, executive committee meeting minutes, Columbia First's accounting ledger, and net worth calculations. *Id.* at 29–33. Further, defendant has not had access to any board meeting packages. *Id.* at 32. Because these documents are exactly what the government relies on in preparing a defense in these types of case, defendant argues, the loss goes beyond mere relevance to actual prejudice. *Id.* at 80.

Plaintiff focuses on the element of "culpable breach of duty," arguing that there has been no showing of bad faith in this case, and that bad faith is an indispensable element of spoliation in this circuit. Pl.'s Opp. at 37. Plaintiff relies on the Federal Circuit's finding in *Eaton Corp. v. Appliance Valves Corp.,* 790 F.2d 874, 878 (Fed.Cir.1986), that bad faith was a necessary element of the spoliation doctrine. Pl.'s Opp. at 37.

■ While defendant correctly points out that *Eaton* was a patent case and therefore applied the law of spoliation of the district in which the case arose, Def.'s Reply at 16, plaintiff replies that bad faith has been held to be indispensable in two other spoliation cases in this court. Pl.'s Opp. at 37. In *Slattery v. United States,* 46 Fed.Cl. 402, 405 (2000), and *Hardwick Brothers Co. II v. United States,* 36 Fed.Cl. 347, 417 (1996), *aff'd on other grounds* 168 F.3d 1322 (Fed. Cir.1998), *cert. denied* 526 U.S. 1111, 119 S.Ct. 1754, 143 L.Ed.2d 787 (1999), this court found that bad faith was required by the Federal Circuit. In the absence of persuasive argument against these authorities, the court finds that there must be a showing of bad faith before plaintiff can be sanctioned under the spoliation doctrine for the loss of the documents.

■ Defendant argues that plaintiff's failure to implement adequate safeguards for the documents in light of the court order constituted bad faith. Def.'s Reply at 15. Defendant is able to point to many cases in other districts where this is the case, but none in this circuit. *Id.* (citing *Procter & Gamble Co. v. Haugen,* 179 F.R.D. 622, 631–32 (D.Utah 1998), *aff'd in part, reversed in part,* 222 F.3d 1262 (10th Cir.2000); *Mobley v. McCormick,* 160 F.R.D. 599, 601–02 (D.Colo.1995); *In re Gros,* 173 B.R. 774, 776–77 (Bankr.M.D. Fla.1994)). Defendant also argues that this court may impose a sanction under Rules of the Court of Federal Claims Rule (RCFC) 37(b)(2) when a "party fails to obey an order to provide or permit discovery ... or if a party fails to obey an order entered under RCFC 16(b)." Def.'s Reply at 15.

Plaintiff asks the court to apply the more forgiving approaches of *Slattery* and *Hard-*

**704**

*wick.* *See* Pl.'s Opp. at 37. As to the adequacy of safeguards, plaintiff argues that bad faith must be "inferred from the 'totality of the circumstances.'" *Id.* (quoting *Slattery,* 46 Fed.Cl. at 405 (internal citations omitted)). "[C]ourts will not draw this negative inference if the evidence was unintentionally or even negligently destroyed or the destruction can be otherwise satisfactorily explained." *Hardwick,* 36 Fed.Cl. at 417.

Plaintiff argues that the evidence "leaves no question that the loss of the boxes resulted from simply the passage of time rather than bad faith." Pl.'s Opp. at 38. Plaintiff further points to the "frantic efforts" to find the documents, and the fact that some documents were subsequently found to support this contention. *Id.* Because there was no showing of bad faith, plaintiff argues, the spoliation doctrine does not apply. *Id.*

The court believes that the current record supports no more than a finding that plaintiff negligently lost the documents. While plaintiff may have been negligent, the facts so far developed do not require the court to conclude that plaintiff acted in bad faith. Because defendant has failed to show an absence of dispute as to bad faith, defendant is not entitled to summary judgment on its claim of spoliation. Defendant may, at trial, introduce evidence in support of a culpable breach of duty involving bad faith by plaintiff.

■ Defendant has also argued, and the court agrees, that RCFC 37(b)(2) could provide a basis for the court to impose a sanction for the violation of a court order. However, the court declines to do so in this case. Courts are loath to impose a sanction of dismissal for mere negligence, and that is as much as has been shown here. A sanction of dismissal is generally imposed only after frequent, flagrant violations of multiple orders. *See, e.g., Bahramiam v. United States,* 1997 U.S. Claims Lexis 272, at *10–12 (Fed.Cl. Nov. 21, 1997). In this case the violation of the court order did not involve "frequent, flagrant violations." On the record developed so far, the court does not find dismissal an appropriate sanction for plaintiff's negligence in losing the documents.

### III. Conclusion

For the foregoing reasons, Defendant's Motion for Summary Judgment Upon Plaintiff's Damages Claims is GRANTED as to the hypothetical cost of replacement capital, and DENIED as to as to plaintiff's claim for lost profits. Defendant's motion for dismissal or summary judgment based on the doctrine of spoliation or RCFC 37(b)(2) is DENIED without prejudice. On or before Wednesday, January 15, 2003, the parties shall file with the court a joint status report, or, if they cannot agree, separate status reports, proposing further proceedings in this matter.

IT IS SO ORDERED.